NATIONAL LABOR RELATIONS
BOARD
v.
FALLS CITY CREAMERY CO.
No. 14794.

United States Court of Appeals,
Eighth Circuit.
Nov. 10, 1953.

Martin Sacks, Atty., National Labor Relations Board, Kansas City, Mo. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Elizabeth W. Weston, and Henry Rose, Attys., all of National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Harry R. Henatsch, Omaha, Neb. (Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., on the brief), for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

COLLET, Circuit Judge.

This cause is before this court on the petition of the National Labor Relations Board to enforce its order directed to Respondent Falls City Creamery Company of Falls City, Nebraska. Jurisdiction is not in question. The cause originated upon a complaint filed by the teamsters' union against respondent, charging acts of intimidation, threats and surveillance, designed to discourage union affiliation by its employees, and the discharge of two employees, John and William Schlicker, because of their activity in undertaking to organize a union of respondent's employees. The trial examiner found that Charles James, president of respondent, committed an act of unlawful surveillance by driving near enough to the home of William Schlicker to be rec-

ognized by employees gathered there for a union meeting on the evening of April 24, 1951; that a foreman, Gililand, had committed acts of unlawful intimidation by stating to an employee, Virginia Foster, that if she joined the union not to say anything to anyone about it, because if she did she would probably get fired; and in stating in answer to a question by Wilma Stump as to what he thought of the union movement, that he did not think there would be as much work for her if there was a union. The trial Examiner further found that John and William Schlicker were unlawfully discharged because of their activity in undertaking to establish a union. The Board adopted the findings of the examiner and issued its order requiring the reinstatement of the two employees and prohibiting acts of coercion or intimidation. Enforcement of the order is resisted upon the ground that the alleged acts of surveillance and intimidation were not unlawful and that the discharge of John and William Schlicker was not on account of any union activity on their part but was because of their misconduct. The nature of the issues presented requires a somewhat detailed recital of the facts relating to each. First, as to the charge of unlawful surveillance.

Respondent has been engaged for many years in the creamery and poultry business. There had been no union of its employees at its plant. It employs a total of approximately 80 employees. It owns and operates a number of large trucks of the semitrailer type with which cream, eggs and other produce are transported from gathering points in Nebraska and Kansas regularly, and occasionally from more distant points. At the plant in Falls City, Nebraska, butter is manufactured, eggs are candled and processed, poultry is killed and dressed, and other operations incident to a business of this type are performed. The business had been under the active management of Charles James and Earl Tubach for several years prior to the return

of James' son, Robert James, from the service in 1946. About 1949 Robert James was placed in the position of actively managing the creamery business and his father relinquished active management.

During the early part of 1951, respondent's business was losing money. It was determined that the plant had to be remodeled. Charles James resumed active participation in the operation of the business and the over-all supervision of the remodeling work, although Robert remained in primary charge of its management. Charles James had final authority. In the later stages of the remodeling work it was necessary to suspend temporarily the processing of cream while the laying of concrete floors in that part of the plant was being done. Regular employees were working overtime at nights in order that the work might be completed in time to process approximately $60,000 worth of cream that had accumulated before it became necessary for it to be processed by another plant at a loss of four or five thousand dollars, or totally lost. An incident was reported to Charles James of one of the employees refusing to assist in replacing churns in position on the night of April 19, 1951. When, on the night of April 20, Charles James questioned the workman about the incident, the workman cursed him and attempted to hit him with a rock, whereupon James discharged him. The afternoon of April 20, Charles James ordered John and William Schlicker discharged. When Foreman Kelly informed William that he was discharged, William showed him a union card. Kelly reported the incident to Robert James. It was reported to Charles James by the truck foreman, Chever, that when Chever gave John Schlicker his check the evening of April 20, 1951, that Schlicker said he would be back in about three days, and directing a profane epithet [1] to Chever, said, "I got you * * * right where I want you." James testified that these incidents gave him considerable concern.

1. He called him a dirty s. o. b

He and Robert James insist that they knew nothing of any union activity on the part of the Schlicker brothers prior to the time of their discharge. The trial examiner concluded that the inference was justified that they did. Whether they did or not, which will be discussed more in detail later in connection with the question of the discharges, it is undisputed that Charles James called the employees in the candling department together on April 23, 1951, and told them in plain words that he had no objection to their forming a union if they wanted to, and that their work would not be jeopardized if they did so. James testified that because of the incidents referred to he was keeping the plant under closer observation. On the evening of April 24, 1951, he went by the plant about 7 p. m. The major part of the plant is located between Stone and Chase Streets. Both of those streets run north and south. Stone is on the east and Chase on the west side of the plant. The numbered streets run east and west. Sixth Street is on the north side of the plant. The plant is near the south edge of the town. James drove south from uptown to the plant, drove around it and was on his way back to town on Chase Street when, arriving at Tenth and Chase, he saw a number of cars parked in the middle of the block on Chase between Tenth and Eleventh and another car in the center of the street. He did not know that William Schlicker lived in the middle of the block between Tenth and Eleventh on Chase, or that a union meeting was to be held there that evening, but he was curious and thought there might be a union meeting in progress. We may assume, since the trial examiner was justified in so inferring, that James desired to see whether it was a union meeting. Instead of proceeding north on Chase Street, past William Schlicker's home, he turned east on Tenth Street to Stone, then north on Stone Street to Eleventh, then west on Eleventh. Driving slowly he crossed Chase Street, proceeded on west one block, then south to Tenth, and back east on Tenth to Stone.

James testified he then went north on Stone Street uptown. William and John Schlicker and other employees were in the front yard of William's home and saw James as he passed the Tenth and Eleventh Street intersections with Chase Street. William says he passed those intersections at least six times. John put the number at four or five. The time was fixed at about 7:30 p. m. It was not dark but did get dark about 8:00. The closest James was to the Schlicker place was approximately 150 feet. Chase and Stone Streets were well traveled streets on a direct route from the plant to the business part of the town. There was no evidence of previous hostility toward the union. If there had been union hostility or there was evidence of planned espionage, the conduct of James might constitute sufficient evidence to justify the conclusion that it would have caused employees concern and interfered with their freedom in engaging in union activities, as we have held. National Labor Relations Board v. Laister-Kauffmann Aircraft Corp., 8 Cir., 144 F.2d 9; National Labor Relations Board v. Brashear Freight Lines, 8 Cir., 119 F.2d 379. But assuming the fact to be, as the examiner found, that James was "somewhat interested in what the crowd was doing and that he suspected that a union meeting was in progress," an isolated instance of observation merely to find out what was going on without something to indicate that the information sought to be obtained was to be used to the disadvantage of the employees, or that the conduct was, in view of all surrounding circumstances, such that the employees might reasonably assume the observation would result to their detriment, there could be no restraint, and hence no unlawful surveillance. The Board and the trial examiner misconceived the legal effect of the facts and circumstances shown in finding unlawful surveillance.

■■■ Several charges of unlawful intimidation were presented. Two were sustained by the trial examiner and the Board. One of those two was that Gililand, foreman of the candling depart-

ment, told Virginia Foster, about the middle of May, 1951, as heretofore indicated, "not to say anything to anyone if [she] had joined the union, or if [she] hadn't, because if [she] did, [she] would probably get fired." Gililand denied making the statement. The Board found the testimony of the witness Foster the more credible. It is the prerogative of the Board to weigh the evidence. Under these circumstances the evidence is sufficient to sustain the Board's finding that the statement was made. And if it was made it was an expression of an opinion which carried with it a threat and hence was prohibited by the Act.[2] Foster testified that Gililand hired her. If he did, as the Board could have found from her testimony, she was justified in believing that he could fire her, or at least in believing that he expressed the sentiments of respondent. International Association of Machinists, Tool and Die Makers v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309. That such a statement is coercive and prohibited is well settled. National Labor Relations Board v. Laister-Kauffmann Aircraft Corp., 8 Cir., 144 F.2d 9; National Labor Relations Board v. Litchfield Mfg. Co., 8 Cir., 154 F.2d 739. The Board's finding of unlawful intimidation on this ground must stand.

The other charge of intimidation which was sustained is based on the following testimony of Wilma Stump:

"Q. (Interrupting) Now, did you ever join a labor union while you were working for the Company? A. Yes, sir.

"Q. When did you join if you can recall? A. Must have been in April sometime.

"Q. And, who signed you up? A. Bill and John Schlicker.

"Q. Now, did any of your foremen or Company officials ever speak to you about the union? A. The only thing that was ever said was one evening when I got off from work about 7:30, I just went through and Bob Gililand was standing there, I said, 'Bob, what do you think about the union?' He said, 'Well, I think it is going in, you won't have as much work.' I think that's all that was said.

"Trial Examiner Mullin: Fix the time and place, counsel.

"Q. (By Mr. Hoffman) Where did this conversation take place, Mrs. Stump? A. Down in the stock room.

"Q. When with regard to the time that you were signed up in the union? How long was it after? A. I'd say a month or anyway three weeks."

There had been discussion among the employees concerning whether, if they had a union, the existing practice of an employee in one department shifting from that department when work was slack there to another where they could be used, and thereby avoid a layoff, could be continued. James had been asked his opinion by other employees. He did not know but expressed the opinion that un-

---

2. "§ 157. Right of employees as to organization, collective bargaining, etc.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, * * * and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, * * *." 29 U.S.C.A. § 157.

"§ 158. Unfair labor practices

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

    \*    \*    \*    \*    \*    \*

"(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

29 U.S.C.A. § 158.

der union organization such transfers might not be permissible. A foreman who had belonged to a union prior to working for respondent, in answer to the same question had given his opinion that it would depend on the union contract. The trial examiner, in his report, referring to this statement by Gililand to Stump (and the statement attributed to Gililand by the Witness Foster), said: "It is well settled that such remarks as those of Gililand are coercive. I so find and conclude that by such statements, the Respondent violated Section 8(a) (1) of the Act."

■ As heretofore stated, insofar as the statement attributed to Gililand by the Witness Foster is concerned, we agree that it was subject to that interpretation. But we do not understand that the expression of an opinion, in answer to a question, without any animus toward the union, and without any express or implied threat is prohibited by the Act. 29 U.S.C.A. § 158(c) heretofore quoted in the margin. While the Board is entitled to view incidents of this nature in connection with all circumstances shown and place its own interpretation on the statement to the extent that the language of the statement reasonably permits, Elastic Stop Nut Corp. v. National Labor Relations Board, 8 Cir., 142 F.2d 371; Coca-Cola Bottling Co. v. National Labor Relations Board, 8 Cir., 195 F.2d 955, and while Sec. 158(c) does not sanction coercive statements or interrogation, as held by this court in National Labor Relations Board v. Minnesota Mining & Mfg. Co., 8 Cir., 179 F.2d 323, still the language of Gililand's answer to the Witness Stump's question is not fairly susceptible, under the circumstances, to a construction implying any threat or hostility to the union. It is apparent that when Gililand stated his opinion that there would be less work, he meant that in his opinion transferring back and forth between departments could no longer be followed under a union contract, and not that respondent would penalize the employees with less work if they organized a union. We are of the opinion

that the trial examiner's inclusion of this statement with the other, characterizing both as coercive, was inadvertent and not justified by the meaning of the statement and the intent of the Act.

■■ The Board found that William and John Schlicker were discharged because of their activity in behalf of the establishment of a union. That finding is challenged on the ground that there was not substantial evidence to support it. Congress has given us a clear direction to be followed in determining that question. The Labor Management Act of 1947 directs that "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C.A. § 160(e). National Labor Relations Board v. Minnesota Mining & Mfg. Co., 8 Cir., 179 F.2d 323. We must not weigh the evidence and substitute our judgment for the Board's as to which of conflicting evidence is entitled to the greater weight, if our judgment in that regard should differ from the Board's. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 596, 61 S.Ct. 358, 85 L.Ed. 368. But when we say we must not weigh the evidence, the term weigh is used in its legal sense, connoting a determination of which evidence carries the greater conviction. That, under the law, is the function of the Board. But when we discharge our responsibility of determining whether a factual conclusion is supported by substantial evidence on the record considered as a whole, we must actually weigh the evidence. But then it is "weighed" in another sense entirely; not to determine whether the evidence supporting the Board's finding is more convincing or of greater weight than evidence to the contrary, but for the purpose of comparing both and determining whether by comparison the evidence followed by the Board is substantial when compared with all the evidence in the record on the subject. Thus it results that when all of the evidence on the issue in question is meager—when, for example, the only evidence of the motive of

discharge of employees is union activity, slight evidence of union antipathy by the employer, and coincidental discharge, the evidence supporting the conclusion that the discharge was on account of union activity may be "substantial". And in other cases where that same evidence is present but with it in the record is a mass of evidence so preponderant that by comparison the meager facts, "substantial" standing comparatively alone, shrink to such a comparative insignificance that they cannot be said to be substantial in the light of the entire record, a finding based upon them has not been permitted to stand.

■ We are committed to a policy of ordinarily not reviewing the evidence in detail in these cases. National Labor Relations Board v. Minnesota Mining & Mfg. Co., 8 Cir., 179 F.2d 323, 325. Our respect for the Board's judgment, and the fact that it is the expert in its field, prompt us to depart from our usual practice and to demonstrate our grounds for concluding that the evidence supporting the Board's finding was not substantial in this instance.

The issue of fact was whether the Schlicker brothers were discharged April 20, 1951, for reasons other than union activities or whether respondent, knowing of their union activities, discharged them for that reason.

William Schlicker went to work for respondent at the age of 18 in November, 1942. He quit in 1945 to run a filling station with his brother John. When he returned to respondent in 1947 he became the poultry killer. That work required skill. His skill increased with experience. His duties as poultry killer did not require all of his time. When not so engaged he drove a truck, did engine room work and general work around the plant where he could be useful. He was reprimanded for tardiness sometime in 1947 and told he would be discharged if he did not start getting to work on time. There appears to have been no further complaint of his conduct until early in 1951.

In October, 1950, Robert James attended a convention and became interested and impressed with an electronic method of killing chickens called an electric knife, displayed there, which eliminated the need for a skilled poultry killer. One was ordered about a week prior to William's discharge April 20, 1951, and has been in operation since its receipt shortly after April 20, 1951. January 7, 1951, William and John Schlicker started an auto salvage and junk business in the back yard of William's home. William devoted 26 hours a week to that work in the evenings and on Sunday. When the remodeling of the plant began in January, 1951, William's services were used and useful. He assisted in the installation of plumbing, electrical wiring, and other work during the day. The work was continuing day and night. At night the work preliminary to the next day's work would be done, in order that there would be no waiting period for the skilled workmen, plumbers, and others. As the construction work on the churn room progressed and it became necessary to shut down the processing of cream, the large quantity of cream heretofore referred to accumulated and the need for haste in the completion of the churn room became more imperative. Robert James requested William to work overtime, at night, as others, including himself, were doing. William declined, excusing himself upon the ground that he wanted to paint his car that evening. That appears to have been between April 1 and April 9, 1951. A month later the car had not been painted. When the construction work on the south half of the churn room began, Griffith, respondent's engineer, who was working nights himself, asked William to work overtime and was refused. When work on the north half of the churn room was being done, he requested William to help at night. William refused to do so on the ground that he did not want to work at night. On March 20, 1951, Robert James called William and John into Charles James' office and talked to them about the extent of their junk business and

whether it would interfere with their work for respondent. William and John say that in that conversation Robert James told them that if the junk business should get so extensive that it would be necessary for them to quit respondent's employment, Robert desired thirty days' notice of such fact in order that he might be able to replace them—that they were indispensable. Robert says that he did not ask for notice or tell them they were indispensable. But all agree that the interference of the junk business with William and John's work at respondent's plant was the subject of discussion on that occasion. Charles James came in as William and John were leaving. After the Schlickers left, Robert explained to his father that there had been complaints about both Schlickers—about John not following instructions about handling his truck route and about William being uninterested and dilatory in his work, and that he had been talking to them about the possible interference of their junk business and said that the situation could probably be straightened out. During the construction work on the south side of the churn room, in the first part of April, Charles James asked Griffith about 3 a. m. one morning why William Schlicker was not helping. Griffith told him that he had tried to get William to help, with the others, but that William just would not work at night. Griffith testified that he asked William frequently to help at night and that William told him he was working at his junk business. William Schlicker testified that he was asked to work only once by Robert James, about April 10, the occasion when he wanted to paint his car, and was not asked again. About April 15, 1951, Robert James inquired of the plant superintendent Hoel, two of the foremen, and the engineer, Griffith, whether they knew what the explanation was for William's lackadaisical attitude toward his work. The remodeling work was substantially completed April 19. The next morning Charles James called in Gililand, and about 2:30 that afternoon, Robert James, the plant superintendent Hoel, and the truck fore-

man Chever. The work records of William and John Schlicker were reviewed at that time. William's was as just related, John's was as follows.

John Schlicker worked for respondent two weeks in 1943. He returned November 1, 1950, as a truck driver and general plant hand. Being assigned to a regular truck route, the major part of his time was so occupied. He joined his brother in the junk business January 7, 1951, but did not devote much of his time to it. In the early part of April, 1951, after the conference between Robert James, William and John Schlicker, relating to the possible interference of their junk business with their work at respondent's plant, Robert James called in Chever, John's truck foreman, and John, to talk to them about remarks derogatory of the company it had been reported had been made by John to other employees. Chever testified the remarks were too rough to repeat at the hearing. At the conference John admitted that he might have made some of them. When John left the conference Chever requested authority then to discharge John for insubordination, refusal to follow instructions, and his general attitude. Robert demurred on the ground that they might be able to make a good man out of him. On March 22, 1951, respondent's plant manager at Emporia, Kansas, complained to respondent's supervisor at Falls City that John was interfering with the operations of the Emporia plant by talking to the girls at that plant during his layover there, and requested that there be no layover period there. The reason for the layover was disputed. Both John and his foreman, Chever, say that the truck drivers are given considerable latitude as to when they leave the Falls City plant on their regular runs. It requires several hours to run from Falls City to Emporia. John customarily left Falls City early enough to arrive in Emporia soon after noon. He testified that Chever and others instructed him to wait at Emporia until 6 p. m. to pick up all the produce brought to the Emporia plant up to 6 p. m. Chever denied giving

him such instructions. In any event, John usually left Falls City at such time as to require a layover of several hours at Emporia between his arrival time there and 6 p. m. Chever complained to Robert James and others on a number of occasions between December, 1950, and April, 1951, about the length of time John took on his route. According to Chever the run should have taken approximately 25 hours, with an eight-hour layover which the drivers were supposed to take. John was frequently using from 25 to 30 hours without deducting any time for layover. He was not paid for layover time and was charging overtime for a great part of his total time out. A compilation made from John's trip tickets shows that from November 15, 1950, until April 15, 1951, John had 1008 hours of straight time and 895½ hours of overtime. The route was being operated at a loss under those conditions. April 1, John and other truck drivers were put on straight time. Since John's discharge, the driver assigned to that route made the trip in 24 to 26 hours, including an eight-hour layover. About the first of April, 1951, some concrete work was being done at respondent's uptown buying station. John and several other employees were sent there to help. When John was asked by another workman, Reschke, to help, he replied, "I'm not going to run any of that g— d— concrete, nor am I going to wheel one of those g— d— wheelbarrows for nobody. I'm a truck driver and that's, by g—, all I'm going to do." John then went across the street "for coffee", taking one or two other workmen with him. That incident was reported to Charles James by the manager of the buying station and the workman, Reschke. During the churn room construction, Robert James personally observed what he described as John's uncooperative attitude while assigned to that work. On April 9, 1951, Foreman Chever instructed John to take a load of eggs to Topeka, Kansas, and have them there at 8 a. m. for a special reason. John's truck had been loaded the night before. At 8 a. m. when he came to the plant to start, Chever said to him, "I thought you'd be in Topeka." John's only reply was, "Well, I'm not."

When Charles James called in the plant supervisor, the foremen, and Robert, on April 20, and the work records of both William and John Schlicker were gone over and the various complaints were recounted to Charles James, and at least one of the foregoing incidents was made known to him for the first time, he gave instructions that both William and John should be discharged at once. Their time was calculated by the bookkeeper, the checks made up, and Foreman Kelly delivered William's to him about 4 o'clock that afternoon and Foreman Chever delivered John's to him when he got back from a trip later that evening. Neither was given any reason for his discharge. When William and John were given their checks they made known their union affiliation as above related. These incidents were reported to Robert James who in turn reported them to his father that afternoon.

The evidence from which the inference was drawn that Charles James knew of the Schlicker brothers' union activity and discharged them for that reason was that only the day before—April 19, 1951—William and John had gone to Omaha, Nebraska, signed union affiliation cards, brought back a quantity of blank cards, and immediately that evening had begun general solicitation of the plant employees. They secured 16 signers. The following morning, the day of their discharge, John solicited Foreman Gililand and two others. One of the others signed, Gililand declined. Later in the morning William showed Gililand his union card and solicited his signature. Gililand declined, saying that he had nothing against the union but didn't believe it would help him and that he did not want to "stick his neck out".

The trial examiner found that Charles James knew of the Schlickers' union activities at the time he ordered them discharged the afternoon of April 20. That finding is based upon the following: that Charles James' denial of such

knowledge "was not convincing"; that Gililand knew of William and John's union affiliation that morning, and although Gililand flatly denied telling James about it, and William Schlicker testified Gililand was his friend, yet the examiner was "satisfied" that Gililand "brought the matter to the attention of the management"; that as respondent's plant was not large and was located in a small community, about 6,500, it could be inferred that respondent had knowledge of the Schlickers' union activity. Upon the premise that Charles James knew of the Schlickers' union activity, the trial examiner inferred that their discharge was for that reason, upon the grounds that they were discharged within 24 hours of the beginning of that activity without explanation for their discharge; that each had a reasonably good work record; and respondent's unconvincing explanation of the reason it assigns for their discharge.

There is no substantial evidence that Charles James knew of the Schlickers' union activity. It has been held that an inference may arise under proper circumstances that an employer knew of activities in a small plant in a small town. Angwell Curtain Co. v. National Labor Relations Board, 7 Cir., 192 F.2d 899; National Labor Relations Board v. Entwistle Mfg. Co., 4 Cir., 120 F.2d 532, 535. But none of those cases justify a finding based upon such an inference when, as here, there is no direct proof of such fact, there is the positive testimony of all of those who knew of the Schlickers' union activity and could have reported it before the discharges, that they did not report it, the positive testimony of Charles and Robert James that they did not know about it, and when the facts and circumstances are in many substantial respects as consistent with lack of knowledge as they are with the possession of such knowledge. The timing of the discharges is explained by the fact that the urgent construction work was just finished. The fact that they were discharged at that time is as consistent with their discharge for cause as it is consistent with their discharge for union affiliation, if we consider, as we must, all of the evidence in the record. The failure to assign any reason for their discharge, standing alone, is a fact consistent with an improper motive. But standing alone it is comparatively without substantial weight. The explanation of respondent for the discharges can only be unconvincing when the evidence of those reasons is discarded. That we may not do in considering the record as a whole.

Since there was no substantial evidence to support the inference that James knew of the Schlickers' union activity, and their discharge for other reasons is explained, we are unable to find any substantial basis in the evidence as a whole to support the inference and finding that they were discharged because of their union activities.

It is essential to the spirit and intent of the Act that management itself should not only refrain from any conduct which would be directly conducive to restraint of its employees in the free exercise of their rights under the Act, but also that no supervisory officers or employees of the management, whose duties, responsibility, and relationship to management are such that employees may reasonably assume their conduct and statements originate from and express the views of management, should bring about such coercion or restraint by their conduct. It is therefore appropriate in this case that the Board's order be enforced, eliminating therefrom, however, and from the Notice ordered given by respondent, the references to surveillance of union meetings, found unnecessary for the reasons stated herein, and further eliminating the ordered remedial relief to William and John Schlicker. As so modified the enforcement of the order is directed.