**OSCEOLA COUNTY CO-OPERATIVE CREAMERY ASSOCIATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15775.

United States Court of Appeals
Eighth Circuit.

Jan. 3, 1958.

S. F. Wadden, Sioux City, Iowa, and Louis L. Corcoran, Sibley, Iowa (Sifford & Wadden, Sioux City, Iowa, on the brief), for petitioner.

William W. Watson, Atty., N. L. R. B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Owsley Vose, Atty., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and VAN OOSTER-HOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

Osceola County Co-Operative Creamery Association, hereinafter called the Creamery, has petitioned this court to review and set aside an order issued by the National Labor Relations Board on March 26, 1957, pursuant to section 10 of the National Labor Relations Act, as amended (29 U.S.C.A. § 151 et seq.), hereinafter called the Act. The Board in its answer has requested enforcement of its order.

The Creamery is located at Sibley, Iowa, within this Circuit. This court has jurisdiction under section 10(e) and (f) of the Act. It is conceded that the Creamery was engaged in commerce within the meaning of the Act, and that the Union here involved is a labor organization admitting to its membership the Creamery employees.

The Board sustained the trial examiner's findings and conclusions and determined that the motivating cause of the discharge by the Creamery of its employees, Loetscher and Haren, was the union activities of such employees, and that such discharge was in violation of section 8(a) (3) and (1) of the Act.[1] The Board's order requires the Creamery to cease and desist from unfair labor practices found, and from in any other manner interfering with, restraining, or coercing its employees in the exercise of rights guaranteed in section 7 of the Act. Affirmatively, the Board's order requires petitioner to offer reinstatement to Loetscher and Haren, to reimburse them for any loss of pay they may have suffered as a result of discrimination against them, and to post the usual notices.

The issue presented for our consideration is whether the Board's finding that the Creamery discharged Loetscher and Haren because of their union activities is supported by substantial evidence on the record as a whole. It is the contention of the Creamery that Loetscher and Haren were discharged for cause because of their incompetency and inefficiency and their failure to observe company rules pertaining to time for reporting for work and the type of clothing to be worn on the job. The Creamery contends that there is no substantial evidence to support a finding that the union activity on the part of the discharged employees was the cause of their discharge.

Section 10(f) of the Act, so far as it pertains to the scope of review of the Board's order, provides, "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive." The Board's finding based upon substantial evidence on the record considered as a whole may not be disturbed by a court of appeals even though the reviewing court might have reached a different conclusion upon conflicting evidence. The reviewing court has no right to try the case de novo. N. L. R. B. v. Solo Cup Co., 8 Cir., 237 F.2d 521, 522; N. L. R. B. v. Pacific Intermountain Express Co., 8 Cir., 228 F.2d 170. In N. L. R. B. v. Gala-Mo Arts, Inc., 8 Cir., 232 F.2d 102, this court refused to uphold the Board's finding of a discriminatory discharge in violation of the Act. The decision is very brief and contains no discussion of the facts or applicable law.

---

1. The Board denied the Creamery's request for oral argument. The Board's

court on the question of the scope of review states (at page 105):

"The rule with reference to the review of findings of the Board is now, we believe, established by what is said by the Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 464, 95 L.Ed. 456. It is our duty to consider not only the evidence tending to support the Board's findings but also the evidence conflicting therewith. * * *"

The court then quotes from Local No. 3, United Packinghouse Workers of America, C. I. O. v. N. L. R. B., 8 Cir., 210 F.2d 325, 330, as follows:

"Since the decision of the Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 464, 95 L.Ed. 456, it is incumbent upon this court in cases here on petition for review of an order of the National Labor Relations Board to consider the conflicting evidence and if it is our duty to consider it then we must pass upon its weight."

Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, is the controlling case governing the scope of review to be given to National Labor Relations Board decisions. There, the Supreme Court, in discussing the legislative history of the scope of review provisions of the Act, calls attention to public and congressional dissatisfaction with the "abdication" with which some courts granted enforcement of the Board's orders under the Wagner Act, which Act provided that the Board's findings were conclusive if supported by evidence. The Court points out that the present standard broadens the responsibility of the courts in the review of Board decisions, and indicates that no definite formula for judicial review can be laid down but that much must be left to the sound judicial discretion of the reviewing court. The Court does state (340 U.S. at page 490, 71 S.Ct. at page 466):

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Court of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

We now summarize some of the pertinent facts. The Creamery is a farmers' cooperative corporation organized under the Iowa law pertaining to cooperative organizations. It is managed by a board of five directors elected by its 2,500 farmer members. Its employees number 65. The Creamery processes milk and cream and makes butter, powdered milk, cheese, ice cream, and other dairy products.

Loetscher had been employed by the Creamery continuously from 1952 to the time of his discharge on January 12, 1956. He served as a relief driver for various milk pickup routes, and when not so engaged he worked inside the plant as a general helper. Haren was employed during substantially the same period, except for a brief interval during which he was employed elsewhere. His work was that of a general helper. The function of a general helper was to work

where needed and to replace men on regular jobs when such men were absent because of illness or vacation. General helpers at some time or other worked in almost every department of the Creamery pursuant to assignment.

There is strong testimony on the part of the Creamery that Loetscher and Haren disrupted work by habitually reporting late. It was often necessary to phone them to find out if they were coming to work. Loetscher and Haren also frequently failed to observe the company's sanitary rule requiring them to wear white clothes when working with dairy products. There is also substantial evidence that they visited too much while at work, that they loafed on the job, that they interfered with the work of other employees, and that they performed some of their work in an unsatisfactory manner. Three employees testified as to the unsatisfactory work by the discharged employees. Employee Kor, in charge of the storeroom and loading, told Manager Jorgensen in December 1955 that he would prefer not to have Loetscher assigned to his crew because "he didn't do satisfactory work, he was late, a man has always got to wait for him, he'd come out there and start visiting, holding up some of the other fellows, started wrestling and stuff like that."

The trial examiner in his report attempts to minimize the evidence as to the unsatisfactory nature of the work record of the discharged employees. He stated that as he read the time cards, Haren had reported after 7 a. m. on 146 days out of 326 days worked, and that Loetscher had reported after 7 a. m. on 79 out of 95 days worked, which is somewhat less than the number of late arrivals claimed by the Creamery. The examiner also discounts the evidence given by fellow employees as to unsatisfactory work on the part of the discharged employees with the statement that such complaints lack substance and give the impression of animus toward the discharged employees. We find no evidence which indicates bias or prejudice on the part of the fellow employees and consider the deficiencies concerning which they testified to be substantial. We pursue this extensive line of evidence no further as the examiner in his report concedes that there was adequate basis for the discharge, stating:

"In sum, while Haren and Loetscher may not always have reported to work promptly and did not uniformly wear the white attire required by the Respondent of its employees, although Loetscher may occasionally have stopped his work to 'shoot the breeze' and to skylark, and although Haren did not always clean the ice cream machines suitably, I do not believe that these derelictions of duty or breaches of rules caused their discharge. The Respondent could have discharged them with impunity for any of these reasons, or for no reason. * * "

The Board in its brief filed in the present case likewise concedes that the discharged employees had so conducted themselves as to give cause for discharge.

There is no evidence that there was any contract between the Creamery and its employees restricting the right of the employer to discharge its employees. The examiner in his report finds that discharged employees were not adequately warned that they might be discharged if they did not mend their ways. It is perhaps true that no specific warning of discharge in so many words had been given. It is, however, clear that both employees had been repeatedly criticized for reporting late and thus disrupting work. They had received repeated phone calls at their homes urging them to report, and they had been criticized for not wearing the prescribed clothing while working on dairy products, as well as for other failures in the performance of their work. In any event, there is nothing that requires the employer to warn an employee of danger of a discharge. The decision of whether or not to discharge an employee is up to management. In N. L. R. B. v. Montgomery

Ward & Co., Inc., 8 Cir., 157 F.2d 486, 490, this court states:

" * * * In considering the propriety of these discharges the question is not whether they were merited or unmerited, just or unjust, nor whether as disciplinary measures they were mild or drastic. These are matters to be determined by the management, the jurisdiction of the Board being limited to whether or not the discharges were for union activities or affiliations of the employees."

To the same effect see Indiana Metal Products Corp. v. N. L. R. B., 7 Cir., 202 F.2d 613, 617; N. L. R. B. v. McGahey, 5 Cir., 233 F.2d 406, 413.

■ The fact that a solid basis for the discharge of the employees for cause exists would not, standing alone, prevent the Board from finding that the discharges were motivated by the union activities and affiliations of the employees, provided that there is substantial evidence in the record considered as a whole to support such finding.

The Board, in support of its contention that the discharges were motivated by the Creamery's hostility to union activities of the discharged employees, relies principally upon the testimony of Stamey, a Creamery employee, who had union affiliations in connection with previous employment. This testimony as set out in the examiner's report is:

" * * * He related that about 3 or 4 days after the first trip by Loetscher and Haren to Worthington, he had come to Jorgensen on a matter of plant business, and in the course thereof the following discussion took place. Stamey remarked, 'I heard there was a union coming into the plant down here,' and asked whether there was anything to this. Jorgensen replied he had also heard of this, and asked Stamey what he thought of the Union. Stamey answered 'the union is all right in their place, some places, so far as I know, for I worked for the union.'

In conclusion Jorgensen instructed Stamey to 'keep your ears open and see if you can find out anything, who is behind this, pushing the Union into the plant.' Stamey related another conversation in the plant with Jorgensen during the morning of January 11, 1956, in which the latter asked him in substance whether he thought Loetscher and Haren were behind the union movement in the plant. Stamey replied, 'I don't know for sure. It could be for all I know. I can't stick my neck out on that.' Jorgensen next spoke to him, Stamey testified, in the morning of January 12, 1956, and, referring to Loetscher and Haren, said 'we had a meeting and we are going to fire the boys.' Finally, according to Stamey, Jorgensen told him in his office on the day following the discharges of Loetscher and Haren, 'after we got these boys fired, maybe it will scare a few more of them out and they probably won't get a union into this plant.' "

This testimony is not corroborated in any way, and is flatly contradicted by Jorgensen, the plant manager. The examiner chose to credit Stamey's testimony. We find much in the record which leads us to doubt the validity of such credibility finding. Stamey initiated all the conferences concerning which he testified. Jorgensen knew of Stamey's prior union affiliations. It appears extremely unlikely to us that Jorgensen would confide in Stamey. Stamey and Jorgensen were not intimate. There is no other evidence of anti-union feeling or activity by Jorgensen or any other Creamery official. If there were in fact anti-union feeling on the part of the Creamery management and directors, it appears to us that there would be available evidence as to such attitude. There is no evidence that Stamey publicized the statements allegedly made to him by Jorgensen, or that any of the other employees interpreted the discharges as a reprisal against the employees' union ac-

tivities. However, even if we assume, without so deciding, that we are bound by the examiner's credibility finding as to Stamcy's testimony, the record still lacks substantial evidence to support the Board's finding.

The facts with reference to the manner of discharge should be summarized. Jensen, the plant foreman, on January 11, 1956, ordered Loetscher to report for work at another part of the plant. Jensen testified that Loetscher hesitated, and that it appeared to him that Loetscher was not going to carry out his order, and that he then told Loetscher that "he would have to start moving around a little faster with his work or we'd have to do something about it." Loetscher testified that he did not unduly delay carrying out the order, and that some delay was necessary because he had to change to heavier clothing for the job assigned. Loetscher didn't recall any criticism of his work or attitude. He does concede that he was fearful he would be discharged, and that he went to Worthington that evening to complain to George, the Union representative. Whether Jensen was right or wrong in sizing up Loetscher's work attitude is not material unless there is evidence to support the contention that the discharge was motivated by union hostility.

Jensen testified that on the morning of January 11, 1956, and subsequent to the incident just related, he went to plant manager Jorgensen and recommended that Loetscher and Haren be discharged. Jensen and Jorgensen had frequently talked about the continuing unsatisfactory work records of Loetscher and Haren, and both Jensen and Jorgensen testified that Jensen recommended their discharge and Jorgensen concurred therein, solely upon the basis of the bad work records of the two employees. Jensen positively testified that at the time he made his discharge recommendation he had no knowledge of union activities in the plant. There is no evidence to contradict this statement. Jorgensen advised Jensen that the discharge recommendation would be submitted to the board of directors of the Creamery. That night Jorgensen received a phone call from George, the Union representative, to the effect that some of the Creamery employees had been up to see him, and he advised Jorgensen that the employees could not be discharged. Thereupon, Jorgensen consulted with the Creamery's attorney, and also conferred with said attorney and the board president the following morning. Upon both occasions the attorney advised that the employees could be discharged for incompetency, but that they could not be discharged for union activity. A Creamery board of directors' meeting, attended by four of the five board members, was held on January 12, 1956. The board of directors received and considered the recommendation that Loetscher and Haren be discharged because of their bad work records, and all board members present voted for the discharge. All of the board members testified before the trial examiner. The substance of their testimony is that they had considerable information about the complaints against the involved employees as a result of personal observation and from a discussion at a previous board of directors' meeting at which the discharge of the same employees had been considered. All members of the board of directors testified that they had no knowledge of the union activities of the discharged employees, and that they had no knowledge of the union organization plans, except that they knew that George had called Jorgensen the night before to protest the contemplated discharge.

The examiner seemed to think it strange that the discharge was handled by the board of directors. We do not consider this procedure unusual under the circumstances. The plant is a modest one, and is located in a city with a population of approximately 2,500. The board members, as disclosed by their testimony, knew many of the employees. They had previously considered the discharge of the same employees at an earlier meeting. Moreover, the call from the Union representative disputing the

right to make the discharges was an added reason why the board of directors, because of its responsibility for the management of the corporation, should make the decision. The members of the board of directors all testified in substance that the discharge was based solely upon the unsatisfactory work records of the discharged employees, and there is no substantial evidence to the contrary. After the board of directors had directed the discharge of Loetscher and Haren, manager Jorgensen called said employees into his office and advised each of them that he was discharged because of his unsatisfactory work record. This is undisputed. Nothing was said about the discharged employees' union activities.

Evidence introduced at the hearing indicated that Loetscher and Haren were two of the three employees who went to Worthington on January 3, 1956, to discuss the possibility of unionization with George, a Union representative. They secured Union application cards, each signed an application, and they started soliciting applications from other Creamery employees at night at the homes of such employees. Such solicitation continued for about two weeks, running beyond the date of their discharge. There is no direct evidence that the discharged employees' Union solicitation activity was generally known, or that such activity came to the knowledge of the Creamery's board of directors before it acted upon the discharge.

In many respects the factual situation with reference to the employees' union activities here is similar to that which prevailed in N. L. R. B. v. Falls City Creamery Co., 8 Cir., 207 F.2d 820. There the plant involved had 80 employees and was located in a city of modest size. There, as here, there was substantial evidence of cause for discharge. We held that the fact that the company was a small one, located in a small community, was not alone sufficient to support an inference that the company had knowledge of the union activities in the face of the square denial of such knowledge by the employer and the lack of proof that the employees solicited for membership had reported the activities to management.

Stamey's testimony, heretofore quoted, about Jorgensen's inquiry of him on January 11, 1956, as to whether Loetscher and Haren were behind the Union, even if true, tended to indicate that Jorgensen then had no definite knowledge of Loetscher's and Haren's union solicitation activities. Stamey's evasive reply afforded no additional information.

The evidence of knowledge of the discharged employees' union activities is not in and of itself decisive of this case. If the board of directors had no knowledge of the employees' union activities, then, of course, the discharge could not have been motivated by union animus. Even if the evidence would support an inference of knowledge of union activities, it is still necessary to find substantial evidence to support the inference that the union activities, rather than the unsatisfactory work records, was the motivating cause of the discharge.

Many of the problems now confronting us were before this court in N. L. R. B. v. Montgomery Ward & Co., Inc., supra. There this court, speaking through Judge Gardner said, among other things (157 F.2d at page 491):

"* * * Fragmentary and unrelated suspicions are not sufficient in substance to transform a proper exercise of discharge into an improper one. * * *"

The court quotes from N. L. R. B. v. Citizen-News Co., 9 Cir., 134 F.2d 970, 974, as follows (157 F.2d at page 491, 493):

"The fact that a discharged employee may be engaged in labor union activities at the time of his discharge, taken alone, is no evidence at all of a discharge as the result of such activities. There must be more than this to constitute substantial evidence."

In N. L. R. B. v. West Point Manufacturing Co., 5 Cir., 245 F.2d 783, at page 786, the court states:

"* * * In each case it must be established whether the legal or the illegal reason for discharge was the actually motivating one, and if evidence of both is present we must ascertain whether the evidence is at least as reasonably susceptible of the inference of illegal discharge drawn by the Board as it is of the inference of legal discharge. N. L. R. B. v. Fox Manufacturing Co., [5 Cir., 238 F.2d 211] supra. In doing so we must keep in mind that while proof that a discriminatory purpose was the motivating one is rarely direct, and it may therefore be established from all the circumstances, the burden is throughout upon the Board to establish that it was, and this may not lightly be inferred."

In N. L. R. B. v. McGahey, supra, it is said (233 F.2d at page 413):

"Rotation in personnel is a common thing. The employer does not enter the fray with the burden of explanation. With discharge of employees a normal, lawful legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption, nor does it furnish the inference that an illegal—not a proper —motive was its cause. An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one. * * * *"

██ ██ We believe that the principles stated in the cases just cited are sound. Inferences must be based upon evidence, direct or circumstantial, and not upon mere suspicion. The application of these principles to the facts in this case leads us to the conclusion that substantial evidence is lacking to warrant an inference that the board of directors of the Cream-

ery was in any way motivated by union animus in making the discharges. This conclusion is strengthened by the fact that there is no substantial evidence of union hostility or any effort upon the part of the Creamery's board of directors or officials in any way to interfere with the efforts to unionize the plant employees, save for the flimsy and controverted evidence that after the discharge Jorgensen remarked that the discharge might discourage the efforts to unionize. The evidence to support the right to discharge is very strong. The Board in effect concedes that there is adequate evidence to warrant the discharge of Loetscher and Haren for cause. On the other hand, the evidence to support the inference that the board of directors in making the discharge was motivated by causes proscribed by section 8(a) (3) and (1) of the Act is very weak and unsubstantial.

We conclude that the Board's order is not supported by substantial evidence upon the record considered as a whole.

The order of the Board is vacated. Enforcement is denied.