## ANGWELL CURTAIN CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10461.

United States Court of Appeals
Seventh Circuit.

Nov. 29, 1951.

900

George P. Ryan, Robert D. Risch, Indianapolis, Ind., for petitioner.

David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Mozart G. Ratner, all of Washington, D. C., for respondent.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

This proceeding is before the court on a petition [1] to review and set aside in part an order of the National Labor Relations Board issued against petitioner on May 18, 1951. In its answer the Board requests enforcement of its order in full.

Petitioner is an Illinois corporation having its manufacturing plant in Greencastle, [2] Indiana, where it engages in the manufacture and sale of draperies and curtains. In August, 1949, it had about 70 shop and maintenance employees. Stella Thomas (hereinafter usually called Thomas) was, in point of service, one of the oldest employees in her department. She was an efficient worker and had received three merit increases of 5¢ an hour each in addition to a general increase given to all employees. She was frequently called upon to instruct new employees in the sewing machine operation.

In July, 1949, petitioner experienced a business recession, and during a four week period laid off 18 employees. Seven were laid off the first week, 8 the second, 2 the third, and 1 the fourth. Thomas was laid off July 29, during the third week of said period. On August 10, while applying for unemployment compensation, Thomas met several other employees who likewise had been laid off, and discussed with them the possibility of forming a union at petitioner's plant. On August 12 Thomas was instructed to report back for work on August 15. On August 14 Thomas obtained from her husband the name and address of Hugh Gormley of Indianapolis, Indiana, regional director of the American Federation of Labor, which she turned over to employee Davis. On August 15, the day Thomas re-

1. Under Sec. 10, National Labor Relations Act, 29 U.S.C.A. §§ 151–166, as amended by the Labor-Management Relations Act, 1947, 29 U.S.C.A. §§ 151–166.

2. Greencastle is a community of about 6000 population, located about 170 miles from Chicago.

ported for work at Greencastle, employees Davis and Surber went to Indianapolis to interview Gormley, who furnished them with union application cards and gave them instructions to contact other employees at their homes to get them to sign cards. Returning to Greencastle that night, Davis and Surber went to the Thomas home where Thomas signed one of the cards. These three visited the homes of other employees on that and the two succeeding nights, soliciting signatures to the union cards. Also, immediately after work on August 17, Thomas and employee Castle solicited signatures in Castle's automobile parked outside the plant. They were talking to employee Staggs and another employee when Thomas saw Hoover, the factory manager, observing them from one of the windows of the plant. Thomas told Castle that Hoover was watching them and that they better drive on, which they did. Several days later, Blocker, the general manager of the plant, summoned employee Staggs to his office and asked her whether Thomas or Castle had said anything to her about the union.

On August 18 Gormley petitioned the National Labor Relations Board for an election to determine whether petitioner's employees desired to have the union as their bargaining representative. On the same day the sub-regional office of the National Labor Relations Board at Indianapolis addressed a letter to the company notifying it of the filing of the petition; this letter was received by the company on August 19.

On August 18 Stella Thomas was called to the office by Hoover, who informed her that she was discharged. Although employee paychecks were usually prepared at Chicago, Thomas was given a check, dated that day, covering her pay to date. There is substantial evidence in the record to support the Board's finding that Hoover told Thomas she was being discharged due to lack of orders; that when she asked if her layoff was final, Hoover said, "It is according to the outcome of this thing that has started"; and that Thomas understood "this thing" to mean the organization of the union. Upon the advice of Gormley, Thomas returned to the plant on August 22 or August 23 to inquire further into the reason for her discharge, and Hoover replied, "Now, Stella, you know why." Thomas stated the report that she had started the union was untrue. General Manager Blocker then inquired who had started the union, and she said she would tell him after the election had been held. After being told there were no complaints about her work, Thomas again asked if her layoff was permanent, and Hoover replied, "Wait until this thing is over."

Based upon Gormley's petition [3] an election was held at the plant on September 22 to determine whether a majority of the production and maintenance employees desired to be represented by the union for purposes of collective bargaining. Forty-one voted against and 21 voted in favor of the union; 8 votes, including that of Thomas, were challenged. Following the announcement of the results, Thomas met Hoover outside the plant and told him she would like to see Brambach, the president, in order to inform him that she was not responsible for starting the union activity, and to tell him how the union activity did start at the plant. Hoover went into the plant and on returning told Thomas that Brambach would not see her and that Brambach did not care who started the union. Shortly thereafter Blocker also came out of the plant and informed her Brambach did not want to see her, and he then said to Thomas, "Stella, walk down the street and tell me who it was * * *. You tell me who started it and I will see that you get your job back." Gormley, who was present, advised Thomas not to tell Blocker anything, and he led her away.

The following morning Thomas and six other employees went in a group to the plant and talked to Blocker about returning to work. Several of these employees testified as to what Blocker said at this meeting. In substance it was that the worst wasn't over, as there were 21 em-

3. The company consented to the holding of an election.

902

ployees in the plant who had voted for the union. Three of the employees testified that Blocker asked if they had the nerve to "come back to work" or to "ask for their job" after "this thing we had here yesterday" or after "this thing that happened here yesterday." They also testified that Blocker stated that the 21 employees would be weeded out if they could be identified, because Brambach, the president, would not work under a union, but would close the plant and move back to Chicago, and that anyone who had anything to do with the union would not be reemployed by the company. Thomas asked Blocker if she should be given a separation notice, but he said that was not necessary and concluded the conversation with Thomas by returning her scissors saying, "You may need them to go someplace else."

Later that morning the same group, except two, met Brambach in his office. He told them they had no business in the plant as they no longer were employees of the company. There was testimony that Brambach on this occasion said that the 21 employees in the plant who had voted for the union would be weeded out as fast as they could be found.

The company contends that at the time of Thomas' discharge it did not have any knowledge of her union activity or of any union organizational activity whatever at the plant. It insists that Thomas was discharged because of her hostile attitude toward the company. The alleged basis for such attitude was her disappointment upon not receiving a vacation check for the week of July 4. Because the company instituted a policy, not theretofore announced, of not giving a vacation check to those employees who had not worked ten full months during the preceding year, Thomas did not receive such a check.[4] Upon learning that she would not receive a vacation check, Thomas went into a washroom and cried, and a fellow employee testified that she stated she would cause the company trouble.

The trial examiner filed a report, citing much of the testimony hereinbefore narrated, but discounting the testimony of the officers of the company as to their claimed lack of knowledge of the union activities of Thomas or union activity in the plant prior to the date of Thomas' discharge.

The trial examiner found that Thomas and employee Sutherlin had been discriminatorily discharged, and that the company had engaged in other acts of interference, restraint and coercion, undertaken to defeat the organizational activities of its employees. The Board reversed the finding as to the discriminatory discharge of employee Sutherlin, but otherwise sustained the trial examiner.

The Board ordered the petitioner to cease and desist from discouraging membership in the union by discriminating in any manner against any of its employees in regard to their hire and tenure of employment, and from in any manner interfering with, restraining, or coercing its employees in the exercise of their rights guaranteed by Sec. 7 of the act. Affirmatively the Board ordered petitioner to offer Stella Thomas reinstatement with back pay and to post appropriate notices.

The petitioner does not here contest the Board's decision and order except in so far as it pertains to the discriminatory discharge of employee Thomas because of her union activity. Therefore, the contested issue here is whether, on the record considered as a whole, substantial evidence supports the Board's findings that petitioner discharged Stella Thomas because of her union activity. It is not disputed that if the true reason for Thomas' discharge was her union activity, her discharge was a violation of Sec. 8(a) (1) and (3), National Labor Relations Act, as amended. John S. Barnes Corp. v. N. L. R. B., 7 Cir., 190 F.2d 127, 128; American Steel Foundries v. N. L. R. B., 7 Cir., 158 F.2d 896, 899; N. L. R. B. v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753, 759.

4. The company had granted permission for Thomas to take leave of a month for a vacation in California and leave for a month and a half for an operation.

Although company officials testified that they had no knowledge of any activity looking to the formation of a union prior to the time of Thomas' discharge, the trial examiner and the Board found to the contrary. The record discloses testimony that rumors of union activity had circulated through this small plant for at least a month before August 18. President Brambach had boasted he knew the people of Greencastle and their backgrounds to a minute detail. It was not an unreasonable inference that in a small plant in a relatively small community news of the intense union organizational drive came quickly to the attention of the plant officers. N. L. R. B. v. Abbott Worsted Mills, Inc., 1 Cir., 127 F.2d 438, 440. At the discharge interview with Thomas, Hoover referred to the union activity as "this thing" when she asked if her discharge was final, saying, "It is according to the outcome of this thing that has started," plainly telling her that her future employment with the company depended on the outcome of the election. The Board was warranted in inferring that "this thing" meant the union organizational drive. No other "thing" had recently been started at the plant. On numerous occasions the officers had referred to the union activity and the election as "this thing." On the day after the election Blocker asked employees Partin and Davis if they "had the nerve to ask for" their jobs "after this thing" of the day before. Upon the hearing before the examiner, Blocker admitted that by the use of the word "thing" he meant the union.

We are also of the opinion that the Board made a reasonable inference in finding that Thomas was discharged because of her union activity. The incident of Thomas not receiving a vacation paycheck had occurred about six weeks previously. When she was laid off on July 29 no comment or suggestion was made by any company official as to her alleged hostile attitude. If she did have a hostile attitude it would be natural that it would be manifested most strongly immediately or shortly after it had been provoked. In any event her alleged hostile attitude was no obstacle to her being recalled to work on August

15. It stretches credulity too far to believe that there was only a coincidental connection between Thomas' enthusiastic solicitation upon behalf of the union on Monday, Tuesday and Wednesday and the abrupt termination of her employment on Thursday, at a time when there was plenty of work in her department.

■ The Board properly considered the anti-union attitude of the petitioner. N. L. R. B. v. Chicago Apparatus Co., supra, 116 F.2d at page 759. A few days before the election President Brambach called in each employee separately to explain the company's opposition to the union. Of the six employees who were most active in soliciting for the union, three were never recalled to work, Thomas was discharged, Castle quit the day after the election after being told by Blocker to "keep her nose clean," and only the sixth remains in petitioner's employ.

The company contends that any anti-union statements made by company officials after August 18, the date of Thomas' discharge, have no relevancy. We do not agree. Such statements, reflecting the attitude of the company toward the union at a period closely following the date of her discharge, indicate what its attitude undoubtedly was immediately preceeding that event. Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732, 742.

■ In concluding that the findings and the decision and order of the Board are supported by substantial evidence, we have taken into account the entire record and have given careful consideration to contradictory evidence or evidence from which conflicting inferences may be drawn. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. At various points in the record there was a sharp conflict in the testimony. The matter of credibility was for the trier of the facts. John S. Barnes Corp. v. N. L. R. B., supra, 190 F.2d at page 128. Granting arguendo that there is evidence in the record which would sustain the view contended for by petitioner, we should keep in mind the statement of the Supreme Court in the Universal Camera case, supra, 340 U.S. at page 488, 71 S.Ct. at page 465, 95 L.Ed.

456, that the requirement for canvassing the whole record does not mean that "a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."

The petition to set aside the order of the Board will be denied, and enforcement of the Board's order in full is

Ordered.