## NATIONAL LABOR RELATIONS BOARD v. DEENA PRODUCTS CO.

No. 10509.

United States Court of Appeals, Seventh Circuit.

March 18, 1952.

Rehearing Denied April 29, 1952.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Frederick U. Reel, Robert G. Johnson, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

G. Gale Roberson, Sidney R. Zatz, Carl H. Urist, Chicago, Ill., Henry J. Shames, Chicago, Ill., of counsel, for respondent.

Before KERNER, DUFFY and SWAIM, Circuit Judges.

KERNER, Circuit Judge.

This is a petition to enforce an order of the Labor Board against the Deena Products Company. We shall refer to the respondent as Deena.

The Board found that Deena had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1), by interrogating its employees as to their union activities, threatening reprisals if they engaged in such activities, and promising and

granting wage increases as a further means of discouraging union membership and activity. It also found a violation of § 8(a)(3) and (1) by the mass layoff of all the employees in one department for engaging in union activity, and by discrimination in the selection of certain other employees on the basis of union activity for layoffs for economic reasons.

Deena is engaged in the business of manufacturing electric lamps complete with shades. It has a factory in Chicago and offices at a different location a few blocks away.

According to the evidence of its president, its business is seasonal, beginning to drop off in March and reaching its lowest volume in June. It has been its regular practice, as its seasonal cycle of operations proceeded, to lay off and hire employees as needed, and such layoffs were generally without notice in order to avoid the slackness and carelessness that had been known to occur in work done after notice. In 1946 plans were made for moving all its mass production operations to various locations in Kentucky, retaining the Chicago location only for office and certain specialized manufacturing operations. In March, 1949, a plant was completed in Arlington, Kentucky, in which Deena planned to conduct its principal operations in the future; a plant manager had been hired and trained to take charge; applications for employment had been solicited and a list of about 500 applicants had been compiled. It was just about that time, in March and April, 1949, that all the events upon which the Board based its charges occurred.

The trial examiner reported that in February, 1949, the union started an organizational drive among the Deena employees, meeting strong opposition on the part of management. Many witnesses testified that Deena executives and supervisors interrogated them about its activities and warned them not to join, on threat of discharge. Before March 24, the union had succeeded in signing up all the employees in the frame department and a number in other departments. On that morning two of the organizers stood outside the entrance to the plant distributing pamphlets to the employees as they came to work. At 11:30 that morning the plant superintendent notified all the employees in the frame department that they were being laid off, and handed them their checks. The reason given was a wire shortage, with insufficient to finish the day's work on frames already started. Three of the nine employees in the department testified that he told them the layoff would be of short duration and that they would be called back as soon as a shipment of wire arrived from New York. In the afternoon the two organizers called on the president to protest the mass layoffs and were informed that they were not due to union activities, but that the department was to be moved to Kentucky in accordance with plans made some time before. The following morning all the equipment of the department was loaded on a truck and shipped to the new Kentucky plant. Thereafter Deena bought frames for use in its Chicago plant from another frame manufacturer and, according to its president, although it had always purchased some frames, its purchases were greater when it did not have the frame department.

April 1 and 20 further layoffs occurred. Most of these were in the "art department." A large majority of the employees laid off on each date were members of the union, and the majority retained were non-members. In many cases those laid off had greater seniority than those retained. The reason given for the layoffs was the seasonal slack, and the reason for the selection of the particular employees for layoff where seniority was disregarded was variously given as lack of cooperation, slowing up in production, lack of adaptability, poor attendance record and the like.

Some months after the March shutdown Deena purchased another lamp factory for the purpose of acquiring a patented process for manufacturing shades. For awhile after the purchase Deena continued manufacturing at that factory but in January, 1950, it moved part of the frame department equipment to its own Chicago plant and the rest to the Arlington plant. At that time it set up a new frame department in Chicago and, the Board found, made a bona fide offer of reinstatement to such of its former

frame department employees as it was then able to locate.

The Board found that there was strong anti-union animus on the part of Deena's officials as demonstrated by threats and interrogation which constituted a violation of § 8(a)(1). It further found that the precipitate·shutdown of the frame department was intended to discourage union activity, and that in the case of certain economic layoffs required by the seasonal slack, Deena disregarded seniority in order to lay off union members but adhered to it in laying off non-union members, thus demonstrating discrimination calculated to get rid of union members, a violation of § 8(a)(3) and (1).

As a remedy, the Board proposed to order that Deena cease and desist from the unfair labor practices. However, being in disagreement with the trial examiner as to certain of the acts he thought established by the evidence, it modified the order somewhat with respect to the affirmative action required. Thus, in the case of the frame department, it found that Deena had made a bona fide attempt in January, 1950, to locate and recall the employees laid off in March, 1949, hence that those employees were entitled to back pay only from March 24, 1949 to January 1950.

With respect to the employees discharged in the other departments it stated that it was possible that some of them might have been affected in the reduction of operations even absent the unfair practices, but that the record furnished no basis for determining the order in which they might have been discharged.

In its "Remedy" the Board proposed a scheme for offering immediate and full employment to all employees named in the discriminatorily discharged list, with dismissal of employees hired after the date of discrimination if necessary, and if there were insufficient work for all, reinstatement on a seniority basis or other non-discriminatory method, and a preferential listing for future hiring. It also contemplated back pay for the period between the discriminatory discharges and the non-discriminatory offer of reinstatement in accordance with a formula for deducting pay earned elsewhere during each quarter year from the amount which would have been earned in Deena's employ but for· the discriminatory discharge. This formula and the reasons for its adoption are more fully discussed in the case of F. W. Woolworth Company, 90 N.L.R.B. 289. Since no issue is raised as to the validity of this formula we shall not again refer to it.

Deena denied that it was guilty of any interference with union organization or any anti-union animus, asserting that the Board's finding of such interference and animus was not supported by substantial evidence on the record as a whole. This assertion is, in turn, based on the further assertion that in reaching its conclusions the Board relied only upon the evidence of its own witnesses and completely disregarded the evidence of Deena's witnesses. And, it contends in effect, since some of the Board's evidence was completely discredited by the physical facts, greater credence should be accorded Deena's witnesses.

The evidence to which Deena refers was that of Deans, one of the union organizers, about the events of the morning of March 24. He stated that he stood outside the entrance to the plant distributing literature and that as the employees entered he was able to catch quick glances into the interior when the door opened. He said Deena's plant manager was standing inside the door with a waste basket nearby and, judging by his gestures, he was directing employees to place the pamphlets in the container as they came in. After considerable rather argumentative questioning as to how much he could actually see from his hurried glances into the interior, there followed this question and answer:

"Could you see the time clock from where you were standing as this door was opening and closing?

"I gave leaflets out there on numerous occasions. As I recall it, I believe there was a clock, but I wouldn't want to go on record as being positive of it, and it seems to me there was a clock. I vaguely recollect there being one on the north wall, but I wouldn't want to swear to it."

Later, Deena introduced a diagram showing that the outer door opened on a vesti-

bule which in turn led into a "time clock room," with the clock on the outer wall. This diagram was used to demonstrate that it was a physical impossibility for the witness to have seen the time clock from the point where he was standing, and counsel then stated that his evidence was that he "took two quick glances *into the clock room*, the room behind the door, *saw a waste paper basket beneath the time clock* and he went to a ledge, and saw Homer Weiss making certain gestures." We have found nothing in the testimony of Deans as contained in the appendix of either party to substantiate this statement of his evidence. Weiss, the official named, when asked whether he was standing in the vestibule or the clock room on the morning in question answered: "I was standing in the clock room, probably because it is a morning procedure to be in that clock room. I check the time clocks." He then denied instructing employees to throw the material into the waste basket. However, in view of his very equivocal reply to the question as to where he was standing that day we see no reason why the Board should have been expected to give his evidence greater credence than Deans'.

We have dealt thus at length with what appears to be a minor portion of the evidence because of the significance placed upon it by Deena. It contends that the Board's finding of anti-union animus and the granting of wage increases to discourage union activities was "based upon the testimony of certain of the Board's art department witnesses (obviously coached by Deans, the union organizer, who was exposed as a falsifier). The Board, at the same time, disregarded the testimony of the same number or more of its own witnesses, who were present when the [president's anti-union] speeches were alleged to have been made, whose testimony is directly to the contrary. The Board then went further, and disregarded the testimony of Respondent's president and other of Respondent's employees, whose testimony is directly to the contrary to that of the Board's selected fragments of testimony. * * *"

Our own study of the testimony relied upon by both parties as set forth in their appendices to their briefs indicates no such serious discrepancies in the evidence of the Board's witnesses—at the most we would say there were some inconsistencies, and in some cases the witnesses did not recall hearing some things to which other witnesses testified. But this is not to say that the record, considered as a whole, does not contain substantial and persuasive evidence to support the finding of anti-union animus.

Deena also attacks the finding as to which art department employees were members of the union, asserting that this was based entirely on the testimony of Deans who was exposed as a falsifier. Here again, our study of the record indicates that in practically all cases his evidence as to which employees belonged to the union was corroborated by the testimony of the employees themselves or by their applications for membership.

■■ From our study of the portions of the record presented by both parties we are convinced that the Board made a very fair study of the often-times conflicting evidence and of its examiner's report, rejecting several items found by the examiner because it found them not sufficiently supported by the evidence. Deena's charge that the Board "failed to appraise judicially the conflicting evidence in this Record" is without foundation. In fact, were we to reject the Board's findings from the conflicting evidence it would have to be on the basis of accepting all the Deena evidence and disregarding that of the Board. We need cite no authority for the proposition that it is not our function to weigh the evidence, and where there is substantial evidence in support of the findings on the record considered as a whole, and including all inferences fairly drawn from that evidence, we must accept such findings.

■ Here, as in the case of National Labor Relations Board v. Vail Mfg. Co., 7 Cir., 158 F.2d 664, 666, standing alone, without anything further, the reasons given by Deena for the discharges were perfectly valid, but when the record is viewed and considered in its entirety, the conclusion is,

inescapable that these were not the real motivating factors behind the layoffs. Thus, in the case of the frame department shutdown, while it is true that the slack season was approaching and no doubt there would have been some layoffs within a few days, piecing together the facts of the anti-union animus which was fully established by positive though disputed evidence, the 100% layoff of the one department which had been 100% organized, the transfer of that one department to the new plant without any offer of employee transfer, the necessity for going outside to purchase frames for use in other operations still going on in the plant, we are no more impressed than was the Board by the testimony of the department foreman that he suddenly discovered at 8:30 on the morning of the shutdown that there would not be enough wire to finish the day's operations, or of Deena's president that he immediately decided that this would be a good time to move this single department although he was not yet ready to move the entire plant and had to go out and buy frames to carry on regular operations.

In the case of Maggie Mitchell, we note that while her junior in the department was laid off two weeks after she was, thus denoting a slackening of work, a new employee was engaged on August 30, 1949, without offer of reinstatement to her. And in the case of Louis Lacy, while he was reinstated on August 15, 1949, we note that three employees in his department junior to him were retained during the period of his layoff. The Board could well infer from these facts that their union activity was responsible for their selection for layoff, even though Lacy was subsequently recalled. Similarly, in the case of the art department layoffs, there was ample evidence to sustain the Board's finding that Deena utilized the economic layoff to rid itself of certain union members.

■ Deena contends that the Board improperly shifted the burden of proof upon it to establish nondiscrimination in the shutdown and layoffs instead of sustaining the burden imposed upon the Board to establish discrimination. In reaching its conclusion of animus and discrimination it was not necessary for the Board to resort to the piling of inference on inference which we criticized in Interlake Iron Corp. v. National Labor Relations Board, 7 Cir., 131 F.2d 129. Of course the burden is imposed upon the Board to prove unfair labor practices, and if discriminatory discharges or layoffs are charged as such, then it must establish by a preponderance of the evidence that such discharges or layoffs were discriminatory. However, it may rely upon inferences reasonably to be drawn from the facts found. We think that is all it did in this case.

■ In only one respect do we disagree with the Order of the Board, and that is as to the scope of the reinstatement and back pay provisions. The "Remedy" section, incorporated by reference in the Order, took into account the possibility that some of the employees named in the discriminatory list might have been laid off anyway and provided that this might be taken into account in determining amounts of back pay due and whether jobs would still be available if considered on a nondiscriminatory basis. The Order, however, in terms, required immediate and full reinstatement of all employees named, with back pay apparently for all, without qualification. We think the unqualified order to offer full and immediate reinstatement to the extent that it had not already done so is inconsistent with the proposed remedy that reinstatement and back pay be considered in the light of the possibility of reduction in the number of employees for economic reasons absent the unfair labor practices. It also appears to us that on this record it is equally possible and probable that a reduction in the frame department would have taken place for economic reasons very shortly after the precipitate closing of the department. Even the Board's witnesses who testified that there was sufficient wire on hand to finish the day's operations did not state that there was sufficient to continue normal operations with the full working staff indefinitely through the slack season. We think, therefore, that the same treatment should be permitted of the Appendix B list

(the frame department) as that proposed for the Appendix A list (the art department). With this suggested clarification and modification, we think the Order should be, and it is hereby, ordered enforced.