**SUNSHINE BISCUITS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12695.

United States Court of Appeals Seventh Circuit.

Feb. 8, 1960.

Schnackenberg, Circuit Judge, dissented.

David B. Buerger, Pittsburgh, Pa., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa. (William F. Jetter, Jr., Long Island City, N. Y., of counsel), for petitioner.

Thomas J. McDermott, Assoc. Gen. Counsel, Morton Namrow, Atty., Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Rosanna A. Blake, Washington, D. C., Attys, N. L. R. B., for respondent.

Before DUFFY, SCHNACKENBERG and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is before the court upon the petition of Sunshine Biscuits, Inc. (hereinafter referred to as petitioner or the company), to review and set aside an order of the National Labor Relations Board, issued June 16, 1959, pursuant to Sec. 10(c) of the National Labor Relations Act, as amended (61 Stat. 136, 29 U.S.C.A. § 151 et seq.). The Board's decision and order are reported at 123 NLRB No. 205. In its answer to the petition, the Board requests enforcement of its order. This court has jurisdiction pursuant to Sec. 10(e) and (f) of the Act, as petitioner is engaged in the manufacture, sale and distribution of bakery products for interstate commerce in the states of this judicial circuit.

Following the usual proceedings under Sec. 10 of the Act, the Board, consistent with the report of its Trial Examiner, found that the company violated Sec. 8 (a) (3) and (1) of the Act, by discharging salesman William P. Cawley because of his union organizational activities. The Board also found that the company violated Sec. 8(a) (1) by threatening employees with reprisals if they engaged in union activities, by promising benefits to employees if they refrained from such activities and by interrogating employees concerning their union membership and activities.

The contested issues arise from petitioner's contention that the unfair labor practices found by the Board are without substantial evidentiary support, and the Board's contention to the contrary.

We have carefully checked with the record the intermediate report of the Trial Examiner, approved by the Board, and conclude that it in the main contains a fair summary of the evidence offered by the respective parties. We shall, therefore, utilize such report in our statement of the facts, with such additions as seem important and such deletions as appear immaterial. Respondent maintains and operates places of business in numerous states where it is engaged in the manufacture, sale and distribution of cookies, crackers, biscuits and other related bakery products. Only its Pittsburgh, Pennsylvania, place of business is involved in this proceeding. During the calendar year 1957, and for several years prior thereto, it had nineteen sales territories in the Pittsburgh area, each serviced by a salesman. During the time material herein, Hugh Millsop was its district sales manager and John Faloona its sales supervisor.

One of such salesmen was William P. Cawley, who the Board found was discriminatorily discharged on March 1, 1957. Prior to his discharge, Cawley had been a salesman for more than five years. In January 1956, he became interested in organizing a union. After ascertaining that other salesmen were interested, he contacted the business agent of Local 485 of the Teamsters (herein called Local 485). At the suggestion of the business agent, Cawley invited the salesmen to a union meeting which was held early in February 1956, at which seven of the salesmen signed union cards. Cawley was active, apparently without success, in attempting to induce other salesmen to join the union. In June 1956, Millsop stated to salesman Zabel, "If Mr. Cawley put as much enthusiasm into his work as he did into the union, he could be the best salesman we had in the area. * * * There is always a fellow like Cawley in most organizations. * * * It was easy to combat because Mr. Cawley, if he was segregated from the more susceptible men, he wouldn't be as able to work on this type of thing." Up to this time, all of the salesmen attended a single monthly meeting. Thereafter, the company directed that two meetings be held, with half of the salesmen attending the first and the other half attending the second. After Cawley was discharged the following March, the company reverted to its old practice of holding only one monthly meeting.

Neither Cawley nor the business agent of Local 485 made any marked progress in their organizational efforts. Some of the salesmen suggested that "a salesman's union" would be more appropriate.

Thereupon, in January 1957, Cawley contacted officials of Amalgamated Meat Cutters and Butcher Workmen of North America, Salesmen and Office Workers' Union Local 490. The officials of this Local arranged for a meeting of the company's salesmen on February 1, 1957. Cawley notified the salesmen of the meeting, at which four, including Cawley, signed union cards. (The record does not disclose whether these four were included in the seven who had previously signed union cards.)

In January 1957, Faloona arranged a meeting with two of petitioner's salesmen, Toy and Reese. He met the former shortly after January 1, 1957, and the latter about February 1, 1957. During his meeting with Faloona, Toy referred to rumors that he had been "connected" with the union" and that his name was "kind of black for that" with the company. Faloona stated that he had "more or less" come to see Toy and discuss the report and to "check" Toy's "story." When Toy insisted that he was "completely innocent" and had no intention of joining a union, Faloona replied, "That's good enough for me."

While Reese was on his route, he was met by Faloona and, at the latter's suggestion, they had lunch together. Faloona brought up the subject of the union but warned Reese that he would deny his statements if later repeated by Reese. He informed Reese that the company had ways and means of finding out who started it, who had joined the union, and stated that those who were "for the company" would be taken care of. He stated that the Pittsburgh branch "would close down" if union activities started, just as was done in New York. Among other things, Faloona also told Reese, "Mr. Millsop received a letter from one of the employees that at first they thought the union was just talk, but this particular salesman was contacted by a union man and he was getting worried about his job." Faloona further told Reese that he should contact someone like Don Travis and that Travis would straighten him out on the union situa-

tion; that Reese "should talk to him and see how he is getting along without a union." Faloona suggested to Reese that if he was for the union, to get out for his own good.

On February 21, 1957, Millsop had a conversation with salesman Zabel, during which he stated, "I understand that five or six men signed cards in the union, and I also understand that you are one who has signed. If you are, I would advise you to get your name off the list immediately. I am only telling you this for the protection of all of us, that the company wouldn't hesitate for a minute to close this plant down, if the union, if the salesmen, unionized." Millsop told Zabel that when the salesmen unionized at their New York bakery, it was closed for a three year period, and he felt sure that they would not hesitate to close down a branch with nineteen men in it. He also stated that when the union election came, the company would see who had signed these cards and, after the plant was closed, the men who hadn't signed cards would be taken care of with jobs in other districts, other branches; that the company would see that the men who were loyal to the company wouldn't starve. Millsop further stated in the same conversation, "This fellow thinks he can save his job by organizing a union, but he can't. I have already mailed in bad reports to Philadelphia. I am only awaiting Mr. Inman's approval before firing him." While Millsop did not mention Cawley's name, Zabel testified that the reference was to Cawley. On March 1, one week after this conversation, Millsop discharged Cawley and thereafter "all talk of union activity died."

■■■ It is evident that the testimony which we have related abundantly supports the Board's finding and conclusion that petitioner violated Sec. 8(a)(1) of the Act by threatening employees with a shut-down of the business if the union organized it, by promising benefits to employees if they abandoned their union activities and by interrogating employees in a coercive manner as to their

union membership and activities. We have not overlooked the fact that some, in fact much, of the incriminating evidence above related was denied by witnesses for petitioner. We also take notice of petitioner's contention that the testimony of Zabel, Toy and Reese is unworthy of belief, contrary to the finding of the Trial Examiner and the Board that the witnesses were credible. We have read all the testimony and do not agree with petitioner's contention. True, there are some discrepancies in the testimony of these witnesses but we discern nothing which would furnish justification for petitioner's drastic conclusion. The weight to be attached to and the credibility to be accorded their testimony was clearly a matter for the trier of the facts. N. L. R. B. v. Taitel, 7 Cir., 261 F.2d 1, 3; N. L. R. B. v. Shedd-Brown Mfg. Co., 7 Cir., 213 F.2d 163, 175; Angwell Curtain Co. v. N. L. R. B., 7 Cir., 192 F.2d 899, 903.

This brings us to the issue as to whether the Board properly found that the discharge of Cawley was in violation of Sec. 8(a) (3) and (1) of the Act. Petitioner in its brief treats of this issue first and apparently attempts to segregate the evidence relating to the cause for his discharge from that relating to a violation of Sec. 8(a) (1), which we have previously set forth. We do not think the evidence relating to his discharge can properly be considered in a vacuum, separate and apart from that relating to petitioner's anti-union attitude. The fact is that the evidence is so intermingled that much of it is equally relevant to both issues. However, in addition to the proof heretofore related, the statement of some further facts relating to the issue of Cawley's discriminatory discharge should be made.

■ As already shown, Cawley was discharged by Millsop on March 1, 1957, one week after Millsop's conversation with Zabel, in which Millsop, evidently referring to Cawley, stated, "This fellow thinks he can save his job by organizing a union but he can't." Without any warning that he might be discharged, Cawley was called by Millsop at 11:15 p. m., the day before his discharge, and told to come to petitioner's office the following day. This Cawley did, and at that time was notified by Millsop of his discharge. The reason for the discharge, as stated by Millsop, was in substance that Cawley was an unsatisfactory salesman. Much of the argument here is concerned with Cawley's worth as a salesman. Petitioner attempts to show that Cawley had always had a bad record, which progressively deteriorated. The Board, on the other hand, admits that his record was poor in many respects but argues that it was no worse at the time of his discharge than it had been for many years previously; in fact, the Board claims that his record had improved. We discern no reason to enter into a lengthly discussion of the evidence relative to Cawley's record. This is so for the reason that petitioner had a right to discharge him for good cause or no cause, absent a discriminatory motive.

Petitioner states that the Board "swept under the rug the mass of evidence" as to the numerous deficiencies displayed by Cawley as a salesman. This is hardly an accurate statement because the Examiner in his intermediate report, approved by the board, stated, "The record conclusively shows that, except in the matter of sales, Cawley was not a satisfactory salesman, according to the Respondent's standards. He did not follow the rules laid down in the 'Sales Manual' in a number of respects. For example, he at times failed to rotate merchandise, he did not use the Respondent's samples and advertising material, and he failed to inform customers concerning the Respondent's discount policy."

Of course, it can be argued, as the Board does, that if petitioner desired to discharge Cawley because of his poor work, it would have done so long before it did. On the other hand, it can be argued with equal validity that if petitioner desired to discharge him because of his union activity, it could have done so long before it did. In our view, these suggestions destroy each other.

Petitioner cites two decisions of this court in support of its position that Cawley's discharge was for cause and not discriminatory, as found by the board. Miller Electric Mfg. Co. v. N. L. R. B., 7 Cir., 265 F.2d 225, 226, and N. L. R. B. v. Kaye, 7 Cir., 272 F.2d 112. True, this court in these cases disagreed with the Board's finding that an employee had been discriminatorily discharged; however, they are both clearly distinguishable from the instant situation. In the former case, the court stated (at page 226 of 265 F.2d) "The petitioner fully recognizes the right of its employees to engage in union activities and to organize," while in the latter case the court stated (at page 114 of 272 F.2d), "In this connection, it is pertinent to note that there is no proof of any anti-union bias or activity on the part of respondent." In other words, the sole issue in each case related to the discharge of a single employee, without any proof that the employer was hostile to the union.

In contrast, petitioner in the instant situation, as previously shown, conducted an active anti-union campaign. Both Millsop and Faloona made it plain to the salesmen that no union would be tolerated, and that the services of those who participated in such a movement would be dispensed with. Cawley was the leader in the effort to organize. In the eyes of petitioner's officials, he was a trouble-maker. There is a solid basis in the evidence for the belief that they at first were not seriously concerned with Cawley's efforts, but as he persisted in the course obnoxious to them, they decided that he should be discharged.

Even though there might have been a valid reason for his discharge, we cannot hold, in view of the Board's finding, that Cawley's union activities were not the motivating factor which resulted in his discharge. See N. L. R. B. v. Vail

Mfg. Co., 7 Cir., 158 F.2d 664, 666; N. L. R. B. v. Deena Products Co., 7 Cir., 195 F.2d 330, 334–335, and N. L. R. B. v. Whitin Machine Works, 1 Cir., 204 F.2d 883, 885.

The petition to review and set aside the order of the Board is denied. The Board's request for enforcement of its order is allowed.

SCHNACKENBERG, Circuit Judge (dissenting).

With reluctance I dissent.

As is admitted in the majority opinion, Cawley violated the rules laid down in the sales manual furnished to him as a salesman, in that he at times failed to rotate merchandise, he did not use the petitioner's samples and advertising material, and he failed to inform customers concerning the petitioner's discount policy. It is also conceded that for these violations petitioner had a right to discharge him. The sworn testimony of sales manager Millsop of petitioner before the examiner was that it was not possible for Cawley to do his work properly unless they had the sales supervisor accompany him; and that was why it was decided to discharge Cawley. There was no testimony in contradiction. Petitioner states that it discharged Cawley only because of his inefficiency, and no one knows better than petitioner the reason for the discharge[1] However, the board found that the discharge of Cawley was because of his union activity. There is no evidence that petitioner had a policy under which it discharged any employee for union activity. There is no pattern of discharges for that reason. These facts corroborate petitioner's evidence as to why Cawley was discharged.

The majority opinion rests on the premise that, petitioner having two reasons for discharging Cawley, one legal and one illegal, the board had a right to

1. In addition to the admitted evidence showing that petitioner had a valid right to discharge Cawley for inefficiency, petitioner made offers of proof (which were rejected by the examiner) to the effect that from 1955 to 1956 Cawley's sales increased $4309 on an annual basis, while the sales of the other salesmen increased on an average of $6404.

discard the legal reason and to select the illegal reason, i. e., that with a discriminatory motive, thus constituting a violation of Sec. 8(a) (3) and (1) of the Act. I do not conceive that the board has such a choice. Unless we concede that the examiner and the board members have occult powers, it is apparent that they are not readers of the employer's mind. Vesting the employer's acts with illegality, rather than legality, is an arbitrary choice with no support in the evidence. No administrative officers have a right to search subjectively when the objective evidence in the record lies before them.

What the fifth circuit Court of Appeals said in N. L. R. B. v. Birmingham Publishing Company, 262 F.2d 2, 9, is axiomatic:

"If a man has given his employer just cause for his discharge, the Board cannot save him from the consequences by showing that he was pro-union and his employer anti-union. We have no doubt that the Birmingham Publishing Company was glad to get rid of Edwards. But the Company has a right to operate its plant efficiently. If an employee is both inefficient and engaged in union activities, that is a coincidence that does not destroy the just cause for his discharge. We cannot say, and the evidence does not support the conclusion that the Board can say: Edwards was fired because the Company's officials had an anti-union animus against Edwards.

"The evidence shows beyond a doubt that Edwards left his presses during working hours. * * *"

The determination reached in this case results in a strange situation so far as Cawley is concerned. It is held that he is not only entitled to be made whole for his loss of compensation, but he is also entitled to reinstatement as an employee of petitioner. Thus he is frozen into a job, because, if he is again discharged, presumably an examiner could again look into a crystal ball and determine that he was discharged for union activity and should be reinstated again with reimbursement for further lost compensation.

I would set aside the board's decision.