BITUMINOUS MATERIAL & SUPPLY
CO., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 16365.

United States Court of Appeals
Eighth Circuit.

Aug. 1, 1960.

Max Putnam, Des Moines, Iowa, for petitioner.

Fannie M. Boyls, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Alfred Avins, Atty., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before GARDNER, WOODROUGH and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

Bituminous Material & Supply Co. by its petition seeks the review and setting aside of an order of the National Labor Relations Board issued September 17, 1959, and reported at 124 N.L.R.B. No. 125. The Board, by its answer and request, seeks enforcement.

Original charges alleging violations by Bituminous of § 8(a)(1) and (3) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(a)(1) and (3), were made by Chauffeurs, Teamsters and Helpers Local No. 371, an affiliate of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The Regional Director's complaint alleged (a) Interrogation of employees with respect to union affiliations; (b) Termination on June 10, 1958, of a 5-man "construction crew" consisting of employees Jennings, Meyers, Rebmann, Atkins and Seys; (c) Termination on June 12, 1958, of em-

ployees Marberry and House; (d) Termination on or about June 18, 1958, of employees Nicewanner and Laymon; (e) Termination on or about June 21, 1958, of employees Guldenpfennig and Cooley; and (f) Refusal to reinstate these employees.

After hearing, the trial examiner recommended dismissal of the charges relating to employees Laymon, Guldenpfennig and Cooley. He found and concluded however, that Bituminous had violated § 8(a)(1) by interrogating employees concerning union activities and by threatening reprisals; that Bituminous had also violated § 8(a)(3) and (1) by discharging Marberry, House and Nicewanner; that there was no violation in the termination of the construction crew on June 10; and that there was a violation in failing to recall the crew on or about August 1, 1958. He made recommendations accordingly. The employer filed exceptions. The General Counsel did the same with respect to those rulings adverse to him other than the issue concerning Laymon. The Board adopted the examiner's findings and followed his recommendations with the exception that the Board concluded, one member dissenting, that the crew's termination was also a violation.[1] The Board then issued its usual order requiring Bituminous to cease and desist, to offer reinstatement to the 8 employees and make them whole for any loss of earnings, and to post notices.

Bituminous in 1958 was engaged in the operation of an asphalt and fuel storage and delivery business. It had a terminal at Linwood, Iowa, on the Mississippi River. Some of the products it sold were brought in by river barge, unloaded by "cargo lines" and stored in tanks. On June 9, 1958, and for some time prior thereto, Bituminous had about 30 men in its employ.

The employer asserts in substance (a) that there is not "sufficient evidence", under applicable standards, to justify the Board's findings that the discharges in question were discriminatory and viola-

---

1. Two members, agreeing with this conclusion, felt it then unnecessary to consider the question of the legality of the failure to recall the crew.

tive of the Act; (b) that there was no obligation on its part to recall or reinstate; (c) that the examiner's action in rejecting employer's Exhibit 4 and the Board's affirmance of this ruling were erroneous, and (d) that there was prejudicial bias on the part of the trial examiner against the employer which vitiated the presumption of correctness of his rulings and order.

§ 10(e) of the Act, 29 U.S.C.A. § 160 (e) provides that the "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." So does § 10(f). The standards to be applied in the interpretation of this statutory language are set forth in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. It was there held, 340 U.S. at page 488, 71 S.Ct. at page 464, that the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight"; that this does not mean that this court may displace the Board's choice between two fairly conflicting views; and that this court is not barred from setting aside a Board decision "when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view". It was also said, 340 U.S. at pages 492–493, 497, 71 S.Ct. at pages 467–469, that the examiner's findings are not "as unassailable as a master's"; that his report is as much a part of the record as the complaint or the testimony; and that his findings "are to be considered along with the consistency and inherent probability of testimony".

 We observe, preliminarily, that (a) the existence of a non-prohibited reason for discharge of an employee does not negate a violation of the Act if the discharge is actually for a different and prohibited reason, N.L.R.B. v. Solo Cup Company, 8 Cir., 237 F.2d 521, 525; N.L.R.B. v. Hudson Pulp & Paper Corporation, 5 Cir, 273 F.2d 660, 666; and

see Mitchell v. Goodyear Tire & Rubber Company, 8 Cir., 1960, 278 F.2d 562; (b) that the burden of proving charges of unfair labor practices is on the General Counsel, Local No. 3, etc. v. N.L.R.B., 8 Cir., 210 F.2d 325, 328–329, certiorari denied Local No. 3, etc. v. Wilson & Co., 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648; (c) that the mere fact of discharge creates no presumption of violation and an unlawful purpose is not lightly to be inferred, N.L.R.B. v. McGahey, 5 Cir., 233 F.2d 406, 413; N.L.R.B. v. Ford Radio & Mica Corp., 2 Cir., 258 F.2d 457, 461 (footnote); N.L.R.B. v. Sebastopol Apple Growers Union, 9 Cir., 269 F.2d 705, 714; (d) that a violation may be proved by circumstantial evidence, National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. International Union, etc., 8 Cir., 216 F.2d 161, 164; N.L.R.B. v. Pacific Intermountain Exp. Co., 8 Cir., 228 F.2d 170, 172, certiorari denied 351 U.S. 952, 76 S.Ct. 850, 100 L.Ed. 1476; N.L.R.B. v. International Union, etc., 8 Cir., 1960, 279 F.2d 951; and (e) that, however, fragmentary and unrelated suspicions are not sufficient and "mere suspicion or conjecture can not be accepted as substantial evidence", Local No. 3, etc. v. N.L.R.B., supra, at page 331 of 210 F.2d; N.L.R.B. v. Montgomery Ward & Co., 8 Cir., 157 F.2d 486, 491; Osceola Co. Co-op. Creamery Ass'n v. N.L.R.B., 8 Cir., 251 F.2d 62, 68. With these principles and those of Camera in mind, we consider the evidence here.

This case, as many others, presents conflicting evidence. Management witnesses for the most part take one position and employees another. Management asserts, also, that each discharge was for proper cause, viz., that the crew was running out of work, that Nicewanner quit and that Marberry and House were "horsing around", and not attending to duty and had been considered for discharge. The General Counsel claims that these are only excuses and that union activity was the reason for the terminations. There is even some disturb-

**368**

ing intimation of entrapment. Under these circumstances it is obvious that every witness cannot be entirely correct. Strong arguments can be made—and are made here—supporting the opposing theories of the evidence. These arguments, however, are normally for the trier of fact and not for this court on review. Nevertheless, as required by Camera, we have examined and have been attentive to them.

■ *Marberry and House.* Marberry had worked for Bituminous in the summer and fall of 1957 as a pumper's helper. He returned in April 1958 in the same capacity. His pumper left in May and Marberry was promoted and given a raise. House became Marberry's helper. Marberry signed a union card on June 9. House also signed a card. He and House were discharged on June 12 when they came to work. Marberry testified that he had not received criticism of his work although he had been told on occasion that he would have to keep the pumping area cleaner. When he was discharged he was told that his work had not been satisfactory. He admitted some roughhousing with House. House did not testify.

There is evidence that at midnight on June 11 Bituminous' president and its general manager sought out employee Haynes when he came to work and asked him if he knew of any "card signers". Marberry and House were then identified by Haynes as men who had signed union cards. Upon this evidence and the fact of their discharge the next morning, the examiner and the Board found the terminations discriminatory. Although there is opposing testimony, we feel that this conclusion of the Board is supported by substantial evidence on the whole record.

*Nicewanner and Exhibit 4.* Nicewanner, one of about 15 truck drivers and described by his foreman as "one of my better drivers" in certain respects, had been employed by Bituminous from May to November in 1957, and again beginning March 28, 1958. He signed a union card on June 9. A few days later, while

talking with the manager, Nicewanner asked if anyone had signed union cards. The manager said that they had and asked Nicewanner if he had signed one. He said he had not. The manager said, "Well, if you did, Everett, we don't want you or the truck, either one". The last day Nicewanner actually worked was June 13. On the 16th, at his request, he was given a few days off because his father had sustained a stroke. He left his telephone number with the office girl but received no call. The evidence does not disclose exactly when the employer acquired knowledge of Nicewanner's card signing. However, according to a written statement prepared by the manager and signed by Haynes in August, Haynes on June 17 told the manager of the signing of cards by certain named employees "and some others". The manager in his own testimony described this as "maybe another one or two". Nicewanner telephoned the foreman on the 18th about work and was told that his truck was being loaded but they could not use him any more. A week later when he saw the foreman and suggested to him that his layoff was "because of the union", the foreman replied, "I don't know about that". Nicewanner did tell the foreman that his discharge would make no difference because he had another job. However, he did not take that job.

It was during Nicewanner's testimony that the controversy regarding Exhibit 4 arose. In July 1958 Nicewanner called at the Muscatine office of the Iowa State Employment Service and filed an application for unemployment compensation. His supporting statement, which is the exhibit, was in the handwriting of an interviewer who died prior to the hearing. Nicewanner admitted that he signed the statement but asserted "they got some dates in there all mixed up though" and "that ain't my writing and that ain't true". The statement recited that Nicewanner was employed by Bituminous to June 13, 1958, that the foreman told him his truck was being loaded but that another man was going to drive

it as his services were no longer needed, and that the foreman gave him no other explanation. The exhibit's pertinency is as to the date of discharge. If it was June 13, it was prior to the employer's knowledge, presumably gained only on June 17, of his having joined the union the week before. The examiner rejected the exhibit and this action was approved by the Board.

Here again, in spite of opposing testimony such as the manager's specific denial of his comment to Nicewanner, we feel that the record, viewed as a whole, contains substantial evidence to justify the conclusion that Nicewanner was discharged on June 18 and that this action was taken because of his union affiliation. Compare N.L.R.B. v. Empire Mfg. Corp., 4 Cir., 260 F.2d 528, 530.

The rejection of Exhibit 4 does not affect this result. While the exhibit appears to have been admissible and while the examiner should have received it either as discreditation material or as an admission, N.L.R.B. v. Quest-Shon Mark Brassiere Co., 2 Cir., 185 F.2d 285, 289, certiorari denied 342 U.S. 812, 72 S.Ct. 25, 96 L.Ed. 614; N.L.R.B. v. Local 160, International Hod Carriers, etc., 7 Cir., 268 F.2d 185, 186, it would not have been conclusive in any event upon the Nicewanner issue. The exhibit is susceptible to the interpretation, consistent with this employee's oral testimony, that it says no more than that June 13 was the last day he actually worked as contrasted with the date he received notice of discharge.

*Improper interference with employees.* We have noted above the evidence as to the midnight interview on June 11 which the employer's president and its general manager had with employee Haynes regarding his union membership and any "card signers", the naming of Marberry and House, and the manager's question and comment to Nicewanner on June 12. Employee Mundell also testified that on June 15, employee Hahn, who was his brother-in-law, told Mundell that he had been called that morning to see the manager. Hahn criticized Mundell for his

having signed a card, told him that he was now to start with him on Hahn's insulation crew and that "everybody else got laid off because they signed the union cards", and inferred that Mundell's job was saved only because Hahn was able to take him on the crew. Conduct of this kind is coercive and violates § 8 (a)(1) of the Act. N.L.R.B. v. Minnesota Min. & Mfg. Co., 8 Cir., 179 F.2d 323, 326; N.L.R.B. v. Cold Spring Granite Co., 8 Cir., 208 F.2d 163, 165. Although there are denials and opposing evidence and although Mundell's testimony was not the most direct, we hold that the Board's conclusion on this point is also supported by substantial evidence in the record considered as a whole. Compare Coca-Cola Bottling Co. of St. Louis v. N.L.R.B., 8 Cir., 195 F.2d 955, 957.

■ *The discharge of the construction crew.* This 5-man crew consisted of 3 welders (Meyers, Rebmann and Jennings) and 2 helpers (Atkins and Seys). Prior to their layoff they had erected 3 storage tanks (20,000 barrels or smaller) at Linwood but on June 9 they were working on a cargo line which was almost completed. On that day it was raining. Meyers, Rebmann and Seys went to look for other work on a construction job in nearby Montpelier. They were told there that hiring was done through a Rock Island, Illinois, union. They visited the union's office and were told no new members were being accepted. It was suggested that they organize a union in the employer's plant. At the charging union's office they signed applications for membership, and Meyers and Rebmann brought cards back to Linwood where on June 9 and 10 they solicited and obtained signatures from other Bituminous employees. The men kept the application cards in back pockets of their trousers but pulled their shirt tails out to protect the cards from the rain and to hide them. Jennings had previously been assured of employment through the 1958 season and Meyers had been employed through the preceding winter and also assured of work the following winter.

Bituminous planned to erect a large 55,000 barrel storage tank at Linwood. Meyers had been in Oklahoma to dismantle a tank there and to cut it into sections for transportation and installation at Linwood. A general manager told one of the welders that he wanted this tank completed by August 1. On June 9 earth moving equipment, including an "end-loader", had been sent to Linwood from Des Moines to prepare the tank site. The end-loader was to be there for 2 or 3 days. On the afternoon of June 9 Bituminous' president learned by telephone that another end-loader, engaged in work in Des Moines facing a completion date, had broken down. The Des Moines superintendent asked if he might rent a replacement. The president denied this request and said he would send the Linwood end-loader back to Des Moines. It went back June 10 and the work on the tank was deferred until the machine was again returned to Linwood in late July. There is testimony that had the end-loader remained at Linwood and the preparation of the site then been completed, it would still have been 3 weeks before welders could have been used on the tank job. A superintendent testified that there was not enough work left on the cargo line by the night of June 10 to keep a 5-man crew busy and that he himself could finish that work consisting, as it did, of only some overhead welding underneath the pipes. Jennings himself testified that "we were getting pretty well caught up" and that "there was approximately two days' work left on the cargo line and there were 3 welders on the job". Meyers stated that two men could have done the job in 2 days.

The examiner concluded that the crew's dismissal so promptly after signing union cards raised a question as to the employer's motive. He felt, however, that the record did not contain sufficient evidence to support the necessary finding that before dismissal any member of Bituminous' management knew or even suspected that any or all of the crew had signed cards or had made any organizational moves. He felt that both the intent and the act of concealment of union cards were successful. The Board based its contrary finding on what it felt was the only reasonable inference to be drawn from the facts (a) that some time *after* the crew's layoff Jennings told a superintendent that he carried a card and suggested that this was the reason for his layoff and the superintendent replied, "Well, I can't commit myself"; (b) that at midnight on June 11, *following* the crew's layoff, the employer's president and its general manager had their interview with Haynes; (c) that crew member Atkins testified that when he was laid off on June 10 the superintendent "didn't say specifically but he didn't think I had anything to do with what was going on and that in a few days I could come back"; (d) that Bituminous' discharge pattern with respect to Marberry, House and Nicewanner made consistent an inference that the crew was terminated upon knowledge of their union affiliation; (e) that, with the end-loader at Des Moines having been repaired and back in service on June 10, there was no satisfactory explanation for the employer's failure to rescind its order to send the one at Linwood to Des Moines; (f) that the crew was not permitted to finish the cargo line; (g) that that line was completed later by an independent contractor at higher cost, and (h) that the Bituminous plant was small, which is a factor affording a basis for inference that the employer knew of the union activities.

We conclude that, in the language of Camera, we cannot "conscientiously find" that the evidence supporting the Board's decision here "is substantial when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view". We agree with the examiner who had the benefit of observing the witnesses. The successful concealment of the union cards in the crew's pockets, the substantial completion of the cargo line by June 10, the unavailability for 3 weeks of welding work on the tank job, the crew's

own awareness that their Linwood work was drawing to a close as evidenced by the search by 3 of them on June 9 for other employment, and the lack of any positive evidence of the employer's knowledge or even suspicion of the crew's organizational activities all materially support the element of lack of work as the real reason for the discharge. They are just as supportive of inferences in the employer's favor, and they overwhelm, it seems to us, any contrary inferences which the Board would draw from the later discharge of other employees, from post-discharge comments made by supervisory personnel, and from the suggestion to Atkins that he might come back within a few days. Cf. N.L.R.B. v. Falls City Creamery Co., 8 Cir., 207 F.2d 820, 829.

We recognize that there is authority which regards smallness as a factor supporting, under proper circumstances, an inference of knowledge. Angwell Curtain Co. v. N.L.R.B., 7 Cir., 192 F.2d 899, 903; N.L.R.B. v. Abbott Worsted Mills, 1 Cir., 127 F.2d 438, 440; N.L.R.B. v. Entwistle Mfg. Co., 4 Cir., 120 F.2d 532, 535. But the Falls City case, supra, shows that this inference is not inevitable. While Bituminous with its 30 Linwood employees at the time might perhaps be regarded as engaged in a small operation, the facts present here, in spite of Meyers' testimony that he could be seen by company supervisors all afternoon on June 9 and on the next day, preclude an inference of such knowledge from size alone. To hold otherwise would necessitate our ignoring the admitted and studied efforts by the employees to hide the cards they were carrying (as well as to protect them from rain) by exteriorizing their shirt tails and our assuming their lack of success in that endeavor.

▆▆▆ *The failure to reemploy the construction crew.* Bituminous urges that when a discharge of an employee is not discriminatory, as we have just held with respect to the crew's layoff, there is no obligation to rehire. While it has been said that the right to reinstate-

ment or reemployment depends on whether the employee was discharged or refused reinstatement for union activities, Local No. 3, etc. v. N.L.R.B., supra, at page 329 of 210 F.2d, this means only that discharge for a non-prohibited cause does not entitle an employee to reinstatement. N.L.R.B. v. Montgomery Ward & Co., supra, at page 496 of 157 F.2d; N.L.R.B. v. Scullin Steel Co., 8 Cir., 161 F.2d 143, 151. It does not mean that he may be denied the right to seek reemployment and to have his application considered without bias because of union affiliation. Discrimination in hiring as well as in firing is proscribed by § 8(a) (3). See Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 187, 61 S.Ct. 845, 85 L.Ed. 1271; N.L.R.B. v. Textile Machine Works, 3 Cir., 214 F.2d 929, 931–932. But while discriminatory discharge entails a duty to offer reinstatement without the necessity of a formal application, Idaho Potato Growers v. N.L.R.B., 9 Cir., 144 F.2d 295, 305, certiorari denied 323 U.S. 769, 65 S.Ct. 122, 89 L.Ed. 615, discrimination in hiring, separate from an antecedent wrongful discharge, cannot ordinarily take place where the employer has no knowledge of the willingness of the individual concerned to be hired.

While there is no question here that after the crew's layoff and prior to resumption of the tank work, Bituminous became aware of their union activities, that there had been some non-contractual assurances to the crew in June that they would be used on the tank job, and that instead of recalling the crew other welders and helpers were brought to Linwood about August 1, we have searched this record diligently but fruitlessly in an effort to find evidence of an attempt on the part of any member of the crew to seek tank work in late July or early August. Jennings did testify that in late June "or right after the 4th of July" he "had occasion to drive by the job site" and asked a person in apparent supervisory capacity "about re-employment". He was advised by this man that he did not have anything to do with employ-

ment and that "it was all filled up". There was also the testimony of J. H. Sours, a laborer-welder who had been employed by Bituminous the preceding year. Sours applied to the same person for work in August 1958 when the tank was about completed. Sours testified, "He said well he would like to hire me, but he got orders not to hire anybody from around Buffalo, they wanted to sign up the union and give them trouble over that * * *". No rights of Sours are involved in this litigation and no violation is charged with respect to him. While his testimony might be regarded as affording some indication of the employer's attitude toward reemployment of a construction crew member, had he sought work, it certainly has no positive application to any member of the crew and does not supply the needed element of known willingness of a crew member for work.

■ *The Trial Examiner's Bias.* Bituminous strenuously argues bias on the part of the examiner. There are situations where courts have found bias. Local No. 3, etc. v. N.L.R.B., supra, at pages 329–330 of 210 F.2d; N.L.R.B. v. Miami Coca-Cola Bottling Co., 5 Cir., 222 F.2d 341, 345. We have however, reviewed this record meticulously. A major portion of it is in narrative rather than question and answer form. While there are instances, particularly near the conclusion of the hearing, of conduct and remarks by the examiner which may indicate a tendency on his part to take over the examination of witnesses, to discomfort counsel and to be unnecessarily sharp and impatient, and while there are other instances where a calmer and more polite and judicious control of the hearing may have been in order, we are unable to conclude from the record that there was bias in fact. The controversy involved strong feelings and tension. It is not uncommon for litigants to feel that adverse rulings demonstrate bias particularly where, as was not the case here, they are unanimously adverse. But even the unanimity of rulings is not necessarily indicative of bias. National Labor Relations Board v. Pittsburgh S. S. Co., 337 U.S. 656, 659–660, 69 S.Ct. 1283, 93 L.Ed. 1602. The examiner's findings actually were more favorable to the employer than was the Board's order. A detailed review of the employer's claimed instances of prejudice would unduly lengthen this opinion and would add nothing by way of help in future cases. Our conclusion on the bias point is, we think, well supported by the authorities. Cupples Co. Manufacturers v. N.L.R.B., 8 Cir., 106 F.2d 100, 113; Donnelly Garment Co. v. N.L.R.B., 8 Cir., 123 F.2d 215, 219; Coca-Cola Bottling Co. of St. Louis v. N.L.R.B., supra, at page 956 of 195 F.2d; N.L.R.B. v. Lewisburg Chair & Furniture Co., 3 Cir., 230 F.2d 155, 156.

The Board's order and the accompanying proposed Notice are therefore modified by striking all references to employes Meyers, Jennings, Rebmann, Atkins and Seys. As so modified, enforcement is directed.