BON–R REPRODUCTIONS, INC.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 4, Docket 27290.

United States Court of Appeals
Second Circuit.

Argued Oct. 2, 1962.

Decided Nov. 5, 1962.

899

Seymour W. Miller, New York City (Miller & Seegar, New York City, on the brief), for petitioner.

Paul S. Spielberg, National Labor Relations Board, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel. Marion Griffin and Robert Sewell, Washington, D. C., on the brief), for respondent.

Waldman & Waldman, New York City, for Sign-Pictorial & Display Union Local 230, amicus curiæ.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge.

Bon-R Reproductions, Inc., petitions this court pursuant to § 10(f) of the National Labor Relations Act, 61 Stat. 148 (1947), as amended, 29 U.S.C. § 160 (f), to review and set aside a Board order enjoining certain unfair labor practices and directing the reinstatement of one employee. The Board cross-petitions for enforcement of its order. We modify the order as hereafter stated and grant enforcement of it so modified.

Bon-R, a printer of advertising and sales promotion material, employs about twelve men in its shop. Prior to the events in question, the shop was not unionized. In August 1960, Scrima, an employee, started an organization drive and solicited applications for membership in Sign-Pictorial and Display Union Local 230, Brotherhood of Painters, Decorators & Paperhangers of America, AFL–CIO. On Monday, August 22, Morandi, the union's business manager sent a telegram to Bon-R claiming that the union represented a majority of the employees and requesting recognition as bargaining representative. After Spielman, the president of Bon-R, had been advised of the telegram he came to the shop and called to his office each of the employees in turn and questioned them about their attitude toward the union. The results of the poll contradicted the union's claim to a majority, and later that afternoon Spielman telephoned Morandi to tell him this. Morandi, according to his testimony, offered to conduct a secret ballot, which offer Spielman refused.

The next day, soon after the employees were paid, Spielman called them together and reported the previous day's events. He made some remarks, the nature of which is in dispute, and asked who was behind the union activity. Scrima admitted that he had brought in the union. Spielman discharged Scrima and walked out. A few moments later he returned and told the employees that Scrima had

been fired because he was incompetent and not because of his union activity.

Following the filing of charges by Local 230, the Board issued its complaint, which alleged violations by Bon-R of §§ 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 61 Stat. 140 (1947), as amended, 29 U.S.C. §§ 158(a) (1), (3). Section 8(a) (1) provides that it shall be an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the Act. Section 7, in relevant part, confers on employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 61 Stat. 140 (1947), 29 U.S.C. § 157. Section 8(a) (3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

After a hearing, the trial examiner found that in all the circumstances of the case, the interrogation of employees violated § 8(a) (1), and recommended an appropriate order. He found that the discharge of Scrima did not violate § 8(a) (3) and recommended that that portion of the complaint be dismissed. The Board accepted the examiner's finding of a violation of § 8(a) (1) but it rejected his finding that the discharge was not a violation of §§ 8(a) (3) and 8(a) (1). It issued an order that Bon-R shall:

"1. Cease and desist from:

"(a) Discouraging membership in Sign-Pictorial & Display Union, Local 230, Brotherhood of Painters, Decorators & Paperhangers of America, AFL–CIO, or any other labor organization, by discharging any of its employees, or otherwise discriminating in regard to their hire or tenure of employment or any term or condition of employment.

"(b) Coercively interrogating its employees concerning their union membership or sympathies.

"(c) Threatening its employees that they could not have any union unless it wanted one.

"(d) In any other manner interfering with, restraining or coercing its employees in the exercise of their right to self-organization, to form labor organizations, to join or assist Sign-Pictorial & Display Union, Local 230, Brotherhood of Painters, Decorators & Paperhangers of America, AFL–CIO, or any other labor organization. * * *" 134 NLRB No. 38.

In addition, Bon-R was required to offer to reinstate Scrima with back pay and to post appropriate notices in its plant.

We grant enforcement of the order with respect to the provisions prohibiting threats that the employees could not have a union unless management wanted one and requiring the posting of an appropriate notice. In all other respects the order is set aside.

1. The Interrogation of Individual Employees on August 22.

The interviews followed a standard pattern. Each lasted for just a few minutes, and the entire process was completed in about an hour. Miss Book, the bookkeeper and a stockholder of Bon-R, and Janz, the foreman, were present at the interviews, the nature of which is well shown by the testimony of Reid, one of the employees.

"* * * Mr. Spielman told me that he had received a letter from the Union stating that there was a majority of the people that wanted the Union in Bon-R Reproductions and he wanted to know how the fellows felt about it. He had a yellow pad * * * in front of him, with the fellow's [sic] names on it.

"There was one fellow that went in before me. I was asked to go in after him. And he asked me if I had known anything about the telegram.

And I told him I hadn't. And he asked me how I felt about the Union. I told him I didn't know. I knew nothing about it. I didn't know anything that was in it for me so, therefore, I told him I wasn't sure if I did or if I did not want the Union.

"Q. Did he do any marking on the pad? A. Yes, he had the fellows' names. He checked the 'no' on my name.

\* \* \* \* \* \*

"Q. Did he tell you that he got a letter from the Union or a telegram? Was a telegram envelope on the desk? A. A telegram.

\* \* \* \* \* \*

"Q. About how long did the interview last? A. Two to three minutes.

"Q. Now, at that interview did Mr. Spielman threaten you with discharge or any other discipline if you were in favor of the Union? A. No, he did not.

"Q. Did he promise you any benefits or advantages such as a better job or higher wages if you were against the Union? A. No.

"Q. As a matter of fact, didn't he state to you that he didn't care one way or the other whether you were in favor of the Union or against it? A. Yes, he did.

"Q. Did he make clear to you that the reason why he was asking your opinion with respect to the Union was so that he would know how to answer the telegram that he had received from the Union? A. More or less I'd say."

Substantially the same account is given by all the employees, and by Spielman, Miss Book and Janz. There is a variation only in the case of Ford, who testified that after Spielman asked him whether he would be interested in the union, "He [Spielman] said not that it matters because if he wants the Union in the shop, he will have it. If he doesn't want it, he won't have it." The record is clear that Spielman said nothing else which

could be construed as a threat and made no promises of benefit. Three of the employees testified that Spielman stated positively that he was entirely indifferent to the union. Even Scrima, fired in unpleasant circumstances the next day, testified that no threats were made. Ford testified that there were no threats; despite Spielman's remark to him, Ford said that he would be interested in the union, the only employee to do so. The record thus confirms the trial examiner's conclusion that the interviews were prompted by the union's claim to a majority, that they were brief, and that, with the exception of the remark to Ford, they were conducted without any suggestion that Spielman had any antipathy toward the union.

### 2. The Telephone Conversation with Morandi.

Spielman had reason to telephone Morandi following his poll of the employees, since the result of the poll contradicted the union claim. Most of the conversation concerned this conflict. Morandi testified, and the trial examiner believed him, that when he offered to conduct a secret ballot, Spielman replied that no union would come into his shop unless he wanted it to.

### 3. The Meeting of August 23 and Scrima's Discharge

In the middle of the afternoon, Spielman called the men together in the shipping room, where they were having a coffee break. He told them that despite the negative result of his poll, the union still claimed a majority. What happened next is in dispute except as to its outlines. The trial examiner accepted Spielman's account, with one modification. Spielman testified that:

"Phil Scrima at one point said that he was behind the whole thing and that he was very familiar with the thing, with the union. And I had asked him at that point, I said, 'Well, I asked you yesterday what you knew about it and at that time I was interested in information. Why hadn't

you told me? You were emphatically no against this.'

"He said this—these were his words, 'They had told me not to say anything.'

"I said, 'Who is they? I thought you were working for me. I don't know any they.' I said, 'Why don't you go to work for they?' That was it. I said, 'Why don't you leave?'

"But at that point I was absolutely completely upset for anyone to tell me that someone else told him not to tell me the truth. I must have been very emotional. I just walked away from the meeting at that point."

There is little variation in the accounts of the employees, except that they testified, and the trial examiner found, that Spielman did say just before or just after he fired Scrima that no union would come in unless he wanted it to, or words to that effect. The testimony of the employees also indicates that Scrima's admission of responsibility for the union's presence was probably prompted by Spielman's asking who had initiated the drive and was not, as Spielman's account suggests, volunteered.

A few minutes after Spielman walked out of the room, he returned and told the employees that Scrima was fired because he was an incompetent worker who was damaging his machine and not because he was a union organizer. After he had left again, the men stood around for a few minutes and Janz, the foreman, said something to the effect that if the shop were unionized their salaries might be lower because they would be paid according to the union scale. With that the meeting ended and the men returned to work.

### 4. The Background of Scrima's Discharge.

The record is replete with evidence that Scrima was incompetent and uncooperative. The trial examiner said that

Scrima was "slated for discharge * * * because of inept work virtually dating back to the time of his original employment." Scrima had been hired about five months earlier to operate a precision printing machine. The examiner's report states: "Scrima never mastered the automatic operation because he was unable or unwilling to adjust the machine and he relied on inefficient manual operation. Such operation resulted in damage to the machine and loss of production." On numerous occasions the manufacturer of the machine or a maintenance man had to be called in to adjust or repair the machine. "However, after Scrima's discharge, the machine has operated satisfactorily and has not been subject to constantly breaking down and repeatedly having to be repaired. There were no longer missing, loose, or broken parts, no wires crossed nor gummed up machinery." In addition, there is ample evidence, and the trial examiner found, that Scrima did not get along with the other employees. The examiner's summary, amply supported by the evidence, is as follows:

"Suffice it to say Scrima had been constantly having trouble with the machine, as well as with his coworkers, ever since he had been on the job. It is clear from the record that he ineptly and carelessly if not wilfully mishandled the machine necessitating repeated overhauls and adjustments due to his failure to operate the machine automatically—for which type operation it was designed."

The record shows that Spielman decided to fire Scrima on the Friday before the events in question, before he knew anything of Scrima's connection with the union. On that day, Janz told Spielman over the telephone that an important job had been held up because a part was missing from Scrima's machine, and that Scrima had "found" the part that morning. Both Janz and Spielman suspected sabotage.[1] Janz recommended that

1. The trial examiner said that the conclusion was "inescapable that Scrima had purposely rendered the machine partially inoperable."

Scrima be fired and Spielman said that he would take care of it on Monday when he returned to the shop. On Monday morning, before the union's telegram was received, Spielman spoke to Miss Book on the telephone. She also recommended that Scrima be fired and Spielman said that he would do so when he arrived. The trial examiner concluded that the decision to fire Scrima "was made on Friday, and would have been effectuated on Monday had not press of business on Spielman, and an unexpected turn of events, namely —the advent of the Union—temporarily diverted him from such action." There is nothing in the record which casts doubt on this conclusion.

■ The Board's decision should be affirmed if it is supported by "substantial evidence on the record considered as a whole." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951). On the other hand, it is our duty to set aside its decision if we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Id. at 488, 71 S.Ct. at 465. While this standard is imprecise, it provides as much clarity as the area affords. To elaborate on it by replacing one set of "undefined defining terms," id. at 489, 71 S.Ct. 456, with another would serve no purpose. All that we can do in fulfilling our function is to indicate as clearly as possible the grounds on which we accept or reject the Board's conclusions.

■■ Dealing first with that portion of the Board's order as to which we grant enforcement, we find adequate basis in the entire record to sustain the conclusion that Spielman committed an unfair labor practice in violation of § 8(a) (1) by telling his employees that they would have no union unless he wanted one. The Board adopted the trial examiner's finding that Spielman so stated on three occasions within the first two days after he learned of union activity: to Ford

during the interview on August 22, to Morandi on the telephone later that day, and at the meeting on August 23 before or after Scrima was fired. The examiner noted in his report that Spielman was an "excitable executive" prone to an "involuntary emotional reaction"; and, as discussed more fully hereafter, there is no evidence of an antiunion bias apart from these outbursts. His statements would probably not be characterized as "threats" in any context except that of a labor dispute. Ford did not so construe them. But both the examiner and the Board chose that characterization and we cannot say that it is entirely without foundation. In any event, the prohibitions of § 8(a) (1) are not limited to threats, and Spielman's words, uttered by an employer in the middle of a drive for unionization, do constitute "interference" with the right to organize.

■ There is a further question whether a cease and desist order is warranted by a violation consisting of scattered, ambiguous remarks. See May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945). In Canton Carp's, Inc., 130 NLRB 1451 (1961), the Board found that the employer had threatened economic reprisals against an employee if he did not attempt to secure a favorable result in a Board-conducted election. Despite this clear showing of a violation, it dismissed the complaint, saying that "because of the isolated nature of this remark, it would not serve any useful purpose to issue a cease-and-desist order based thereon." Id. at 1452 (Footnote omitted). See also Atlas Storage Division, P & V Atlas Industrial Center, Inc., 112 NLRB 1175, 1180 (1955), aff'd 233 F.2d 233 (7 Cir., 1956). In other cases, the Board has ruled that "isolated and vagrant" statements or conduct does not even constitute a violation. Playwood Plastics Co., Inc., 110 NLRB 306, 313 (1954); West Texas Utilities Co., Inc., 85 NLRB 1396, 1400 (1949), enforced 87 U.S.App. D.C. 179, 184 F.2d 233 (1950), cert. denied, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366 (1951). A substantial inroad will

be made on the right to express one's views, National Labor Relations Act § 8 (c), 61 Stat. 142 (1947), 29 U.S.C. § 158 (c), if under pain of Board proceedings and contempt of orders issuing therefrom, an employer (or employee) must control his every word or refrain from speaking altogether. But in view of the short time span in which the remarks were repeated three times, we think subdivision 1(c) of the Board's order should be enforced.

■ Subdivision 1(b) of the order enjoins Bon-R from "coercively interrogating its employees concerning their union membership or sympathies." The asserted factual basis for this order is that:

"Not only does the record show employer threats during the course of the interrogations, but it also appears that Spielman, Respondent's president, interrogated some employees about the possible union activities of the others and that he persisted in demanding that the employees indicate how they felt about the Union and whether they would like a union in the plant, and this after each had stated he knew nothing about the Union's telegraphic request for recognition. Moreover, the timing of the interrogations and the fact that the coffee-break meeting sought the same information previously obtained, convinces us that the Respondent conducted these polls for the purpose of interfering with its employee's union and concerted activities, rather than for the purpose of ascertaining whether the Union represented a majority in order to determine whether to accord it exclusive recognition." (Footnote omitted.)

We do not agree with this statement of the Board which, we think, ignores in letter and spirit the factual conclusions of the trial examiner, who found that the pattern of the interviews was entirely innocent. The only evidence anywhere in the record of "employer threats" is the single ambiguous statement made to Ford, who did not understand it to be a threat. The Board disregards entirely the unanimous recollection of the employees, all of whom testified that no threats were made. Nor can we find anything coercive in the general questions which Spielman put to his employees; in interviews lasting only a few minutes, it is incredible that there could have been the delving below the surface or persistence which the Board found. As to the timing of the interviews, they followed immediately on Spielman's being advised of the union's claim to a majority. There was similar reason for Spielman to seek out his employees a second time, since his noncoercive questions had elicited responses which the union's business manager contradicted. The circumstances are exactly those in which the Board has held that noncoercive interrogations are permissible. Blue Flash Express, Inc., 109 NLRB 591, 592 (1954).

We find, therefore, as did the trial examiner, that the interviews of August 22, taken by themselves, come within the protection of the so-called Blue Flash doctrine, which permits questioning of employees "under proper safeguards." Id. at 593. Every one of the criteria announced in that case has been met: the employer had reason to conduct the interviews, he advised his employees of his reason, he made no threats or promises of benefit. The interviews were short and openly conducted, in a background free of hostility toward unions. See id. at 592–595. See also, e. g., N. L. R. B. v. Firedoor Corp., 291 F.2d 328, 331–32 (2d Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961), and cases there cited.

Although the trial examiner concluded that Blue Flash was inapplicable in the circumstances of this case, his conclusion was apparently based on a transparent misreading of Ford's testimony about the interview.[2] Looking beyond

2. The trial examiner said in his intermediate report that Ford's expression of interest in a union "evoked Spielman's declaration" that there would be no union

the interviews to their context, there is nothing in the events which followed to justify an order directed specifically at coercive interrogations. Whether we regard the coffee meeting as a part of continuing interrogations or as a separate event, it provides no basis for the belief that Spielman did use, or will attempt to use, interrogations as a means of interfering with his employees' rights. To the extent that Spielman made remarks which constituted violations of § 8(a) (1), his conduct has been enjoined by the portion of the order which we have sustained. Since the examiner's conclusion was based on a clear error of fact and the Board's conclusion derived from a misreading of the facts as they appear in the record, and since we can find no other basis in the record for sustaining this portion of the order, subdivision 1(b) is set aside.

■ There remains with respect to the § 8(a) (1) violations the Board's order in subdivision 1(d) that Bon-R cease and desist from interfering with the rights of its employees "in any other manner" and with respect to Local 230 "or any other labor organization." We find no warrant for the issuance of such a broad order. In N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930 (1941), the Supreme Court said: "[T]he authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct." And in May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 390, 66 S.Ct. 203, 211, 90 L.Ed. 145 (1945), the Court amplified this by saying: "The test of the proper scope of a cease and desist order is whether the Board might have reasonably concluded from the evidence that such an order was necessary to prevent the em-

ployer before it 'from engaging in any unfair labor practice affecting commerce.'" See also Communications Workers of America, AFL–CIO v. N. L. R. B., 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed. 2d 896 (1960) (per curiam).

■■ Since we find that Bon-R did not commit an unfair labor practice when it discharged Scrima, the record is bare of anything suggesting its management's unwillingness to comply with the requirements of the NLRA except three ambiguous remarks made by Spielman. Except to suggest that the interrogation and "threatening" of employees revealed Spielman's "antiunion animus," the Board made no findings that indicate any likelihood of future violations. The trial examiner concluded, and we agree, that apart from Spielman's ambiguous remarks the record is "devoid of animus." No hostile action of any kind was threatened or taken against Ford, the only employee (apart from Scrima) who told Spielman that he would favor unionization. Ford was laid off on August 26, but was called back to work on a temporary basis thereafter. Holmes, who had told Spielman that he had no interest in a union, was fired on August 26 and not recalled. We do not think that Spielman's isolated remarks, the subject of an order directed particularly at them, can carry the additional weight of a blanket order prohibiting every kind of conduct which § 8(a) (1) covers. Accordingly, we set aside this portion of the order.

■ The discharge of Scrima was not an unfair labor practice because it was not motivated by a purpose to "encourage or discourage [union] membership by means of discrimination." Radio Officers' Union of Commercial Telegraphers Union, AFL v. N. L. R. B., 347 U.S. 17, 42, 74 S.Ct. 323, 337, 98 L.Ed. 455 (1954). We recognize the power of the Board to infer Spielman's motive from his con-

unless he wanted one. Ford's testimony is clear that Spielman's remark to this effect *preceded* Ford's statement that he would be interested in a union. The trial examiner's erroneous reading of Ford's testimony is the only "circumstance" apart from Spielman's similar remark to Morandi which he mentions as taking the case outside the rule of Blue Flash.

duct, see id. at 48–52, 74 S.Ct. 323, but such an inference must be such "as reasonably may be based upon the facts proven." Id. at 49, 74 S.Ct. at 340.

We reject as wholly inconsistent with the proven facts the Board's conclusion that Scrima's work was not unsatisfactory. The trial examiner's summary on this point, quoted above, cannot be doubted. We cannot agree with the Board's statement that apart from some hearsay evidence, "there is no other substantial credible evidence in the record that Scrima's work was inferior."

It is equally plain that Scrima knew his work was not satisfactory to the management. Although he never found the source of his troubles within himself, he testified that the machine which he operated was running badly and that he had had bad relations with other men in the shop. He said that within the two weeks immediately preceding his discharge Janz spoke to him about both problems. About a week before the discharge, Janz asked Scrima to come to his office and Scrima told another employee that he expected to be laid off. The trial examiner found that Scrima expected to be discharged and, indeed, added that he believed Scrima to have started union organizing to shield himself from a deserved discharge. In view of all this, we disagree with the Board's unexplained statement that "the record is devoid of any indication that Scrima was ever reprimanded or admonished because of the quality of his work, or, in fact that he was even aware that his work performance was considered unsatisfactory."

Finally, despite the testimony of Spielman, Miss Book, and Janz that the decision to fire Scrima was made on the Friday before and the examiner's express conclusion to this effect, the Board concluded that this decision was made for the first time at the coffee meeting. Its sole explanation is that if the decision to fire Scrima had been made over the telephone on Friday, Spielman would have told Janz to fire him then or would have done so himself at the latest on Monday when he came to the shop. We may not "displace the Board's choice between two fairly conflicting views." Universal Camera Corp. supra, 340 U.S. at 488, 71 S.Ct. at 465. But in our judgment, the record, supported by the examiner's finding as to credibility, leaves no room for conflict here.

It is, of course, true, that § 8(a) (3) is violated even if there is a legitimate motive for discharging an employee if one of the motives is antagonism to unions. N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725 (2 Cir., 1954). See Sunshine Biscuits, Inc. v. N. L. R. B., 274 F.2d 738 (7 Cir., 1960); N. L. R. B. v. Lewis, 246 F.2d 886 (9 Cir., 1957). Ordinarily, we would not disturb a conclusion of the Board that the discharge of an employee which followed immediately upon his revealing union activities is a violation. But here, as elsewhere, our decision must proceed from an examination of the whole record.

Even standing alone, and taken in their worst light, Spielman's remarks when he fired Scrima are ambiguous.[3] On their face, they say no more than that an employee whose loyalties elsewhere prevent him from speaking truthfully to his employer about a matter of great importance to the shop should go where his loyalties lead him. Scrima's loyalties were to a union, and so the remarks can be understood as expressing an antagonism to the union. The surrounding cir-

---

3. Judge Friendly, preferring the "more colorful" accounts of the employees to Spielman's account, quoted above and used by the trial examiner in his report, sees no ambiguity in the language which the employees attributed to Spielman. But there is very little difference between their accounts and Spielman's, except that an express reference to the union replaces the pronoun "they" which Spielman claims to have used. So long as the employees' stories are understood as different versions of a single incident and not given cumulative effect, they no more than Spielman's account point unequivocally to a discriminatory motive behind Scrima's firing.

cumstances, however, overwhelmingly refute this conclusion.

Within a matter of minutes Spielman expressly stated to his employees that Scrima's discharge was unconnected with his union activities. In the past, the Board has accepted such a recantation made in much less impressive circumstances than the present. In Marr Knitting, Inc., 90 NLRB 479 (1950), the violation consisted of a threat that the plant might be shut down if it were unionized, and the recantation came "about a week later." Yet the Board accepted it, saying: "We believe * * * that this [recantation] * * * was sufficient to counteract the effect of * * * [the] coercive statements and to assure the employees that they were free to engage in union activities without fear of reprisal." Id. at 480. Surely here, there is even greater reason to regard the recantation as honest and as effective to dispel the employees' fears. The "threat" was made in anger, and was withdrawn as soon as the anger died down. There was more than adequate ground to discharge Scrima, and Spielman had already decided to do so. The prior and subsequent history of the shop indicates nothing except the employer's indifference to unions.

The trial examiner, who had the only opportunity to observe Spielman, thought he had no hostility to unions. Judge Friendly dismisses the examiner's finding because "lack of 'union animus' can hardly be discerned from the bearing of a witness months after the event." But as Judge Friendly points out, intentions cannot be directly observed, and a man's honest statement of his intentions is often the best guide we have. Spielman's bearing as a witness may not itself show his intent but it is certainly highly significant in deciding whether to believe his statements about what his intent was. A determination of intent by demeanor evidence is a common occurrence in our trial courts. This being precisely the kind of issue as to which demeanor evidence is relevant, the examiner's finding should accordingly be given "special weight." See 2 Davis, Administrative Law 26 (1958).

As to the effectiveness of the recantation, there is not a single statement in the testimony of any of the employees that Spielman at any time, before, during, or since the firing of Scrima has said or done anything which they regarded as a threat. They all knew, as their testimony indicates, that the machine which Scrima was operating was working badly. They thus had every reason to credit, and no reason to doubt, Spielman's sincerity when he explained his motives for firing Scrima.

Although Judge Friendly agrees with us that the Board based its conclusion on erroneous premises, he would remand to the Board because he thinks the same conclusion could reasonably have been based solely on Spielman's angry remark when he fired Scrima. In our judgment, to hang so much on the slim peg of a few ambiguous sentences is to allow an excerpt of the record to swallow up the whole, something which Universal Camera, supra, forbids. Without giving controlling effect to any one element, we think that the facts surrounding Scrima's discharge, coupled with the examiner's finding on credibility, make up a record which permits only one conclusion. In the light of this record, any other conclusion would amount to a decision, supported neither by reason nor the statute, that even the least improper remarks made in the course of discharging an employee render the discharge an unfair labor practice.

Subdivision 1(c) of the Board's order is enforced. Subdivision 2(c), which requires the posting of notices by the employer, is enforced, the notice to be modified to accord with this opinion. In all other respects the order is set aside.

FRIENDLY, Circuit Judge (concurring and dissenting).

I concur in the Court's disposition save for its setting aside so much of the order as finds Scrima's discharge to have been an unfair labor practice. In view of my agreement with my brothers' conclusions

as to Scrima's conduct, I should be happier if I could conscientiously join in this portion of the decision, too. However, I am forced to conclude that in this respect the majority has gone beyond the power conferred on us by Congress, and that the proper course is to remand this issue to the Board for further consideration in the light of our conclusion that some of the bases on which it rested its decision are untenable.

The issue here was not whether Bon-R had legitimate grounds for discharging Scrima or even whether his discharge reflected such grounds. Discharge of an employee has been held to be an unfair labor practice if it is motivated only in part by the employee's union activities. N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725, 726 (2 Cir., 1954); Sunshine Biscuits, Inc. v. N. L. R. B., 274 F. 2d 738 (7 Cir., 1960). Whether such motivation existed here was a "question of fact" as to which 29 U.S.C. § 160(e) and (f) direct that "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." N. L. R. B. v. Nevada Consolidated Copper Corp., 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 (1942). Evidence to support a finding of fact by an administrative agency is substantial if the evidence is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). A verdict may be directed only "When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." Brady v. Southern Ry. Co., 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); 5 Moore, Federal Practice (2d ed. 1951), 2314; 9 Wigmore, Evidence (3d ed.), 299:

To me it is plain that Spielman's doings on August 23 afforded ample basis for a reasonable conclusion that Spielman discharged Scrima at least in part because of union activity. My brothers quote Spielman's statement of the August 23 incident; the employees' versions were rather more colorful. Scrima testified that, just after his admission of union activity, Spielman said "Right here, as of now, you're fired. Get your clothes and get out." Holmes stated that Spielman told Scrima to take his men down to the union organizer's shop, that nobody could tell Spielman how to run his shop, "and furthermore, you're fired. He said, 'You can pack your gear and get out of here right now'." Ford's testimony was that, as soon as Scrima confessed to union activity, Spielman said, "You're fired here and now. You can get your things and leave." Tyson's version of Spielman's remark was, "Well, if you are working in a union shop, it won't be in this shop, it will have to be in some other shop. If I want a Union here, I will get it. If I don't, it won't come in. As of right now, you're fired." Reid's account was "if you want the Union in here, you can work in a Union shop. You can leave now." It was stipulated that the testimony of three other witnesses "would follow the pattern already established." In the light of all this, I am at a loss to understand what my brothers find ambiguous in Spielman's remarks to Scrima; indeed, if the curtain had dropped at this point and stayed down, the evidence that Scrima's discharge was motivated at least in part by his union activity would have been not only substantial but overwhelming.

True, the curtain rose again, and the Board could properly have disregarded the first act and taken Spielman's statement in the second as reflecting his true intent. But it was not obliged to do so. There is no principle of law or logic that a statement made in anger or emotion inevitably affords a less valid indication of intent than one made after reflection has set in. Indeed, the contrary is true. The exception to the hearsay rule for "spontaneous exclamations" is based upon the very consideration "that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere ex-

pression of one's actual impressions and belief." 6 Wigmore, Evidence (3d ed. 1940), 139. It is for this reason that a hearsay declaration which is "spontaneous, excited, or impulsive", such as Spielman's initial utterance, is admitted under this exception, whereas one which is "the product of reflection and deliberation", such as that made on his return, is not. McCormick, Evidence (1954), 580. Nothing in the testimony of the other employees shows that they regarded Spielman's first utterance as an aberration and his second as the true revelation of his mind. The absence of threats to them is inconclusive, both because Scrima had been the instigator and because, as the Board could permissibly infer, further threats may not have been deemed required.

Bon-R argues that, however all this might be if the Board had heard the evidence or had sustained an examiner who did, here the Examiner's contrary finding tips the scale. This finding was that, despite the words used in firing Scrima, Spielman was then exercising "his predetermined decision to discharge Scrima" for cause and "used language which did not convey his real purpose and motive." The Examiner so found because "not only from the testimony in the record, but from his appearance on the stand, it is and was evident that Spielman, a high strung, temperamental person, misspoke himself when he discharged Scrima." The Examiner thought also that when Spielman "rushed from the room, he was not in control of his emotions or his thinking processes" and that what Spielman said on his return reflected his true intent, since the Examiner was "convinced that Spielman had no union animus." As against this the Board, accepting the Examiner's finding that Spielman was a "high strung, temperamental person", was "convinced, contrary to the Trial Examiner's conclusion, that Spielman's language at the time of the discharge did convey his real motive and purpose."

Part III of Mr. Justice Frankfurter's opinion in Universal Camera Corp. v. N.

L. R. B., 340 U.S. 474, 492–497, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), rejects both polar positions on the effect of an examiner's finding contrary to that of the Board. An examiner's report, being a part of "the record", cannot be excluded from the data a reviewing court must consider in determining whether a finding with respect to a question of fact is "supported by substantial evidence on the record considered as a whole." But the statute "is wholly inconsistent with the notion that it [the Board] has power to reverse an examiner's findings only when they are 'clearly erroneous'," id. at 492, 71 S.Ct. at 467, a point reemphasized in F. C. C. v. Allentown Broadcasting Corp., 349 U.S. 358, 364–365, 75 S.Ct. 855, 99 L.Ed. 1147 (1955). The proper solution lies in between: "The findings of the examiner are to be considered" by a reviewing court "along with the consistency and inherent probability of testimony," with the "significance of his report" depending "largely on the importance of credibility in the particular case"; "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." 340 U.S. at 496, 71 S.Ct. at 469.

Here, insofar as the physical happenings at the August 23 meeting were disputed, we have sustained the version adverse to Bon-R, finding that Spielman repeated his assertion of the previous day that he would not have a union unless he wanted one, and that Scrima's statement was in answer to a question and not volunteered as Spielman said. What remains in controversy is not what happened, but what conclusion concerning Spielman's intent is to be drawn from what happened. Although "The state of a man's mind is as much a fact as the state of his digestion," Edgington v. Fitzmaurice (1885), 29 Ch.D. 459, 483, we have not yet developed mental X-rays permitting this "fact" to be determined by direct observation rather than by in-

ference. With the objective facts here not in dispute, the Examiner had only one datum for inference-drawing that the cold record would not contain, namely, his observation of Spielman, which led him to find that the latter was "a high strung, temperamental person." Lack of "union animus" can hardly be discerned from the bearing of a witness months after the event, although in some instances the contrary might be. Without questioning this finding as to Spielman's emotional make-up, the Board chose to conclude that what Spielman said in anger indicated his intent better than what he said on reflection. Even under the more limiting standards of the "not clearly erroneous" principle, F.R.Civ.Proc. 52 (a), we have reversed a trial judge's finding where, after giving "every possible probative force" to oral testimony of intent, we were convinced that what the man indisputably said made "plain what he really believed." E. F. Drew & Co. v. Reinhard, 170 F.2d 679, 683–684 (2 Cir., 1948). Still more directly applicable is F. C. C. v. Allentown Broadcasting Corp., supra, where the Supreme Court reversed a decision of the Court of Appeals for the District of Columbia reversing an agency's reversal of an examiner's finding that witnesses had been "evasive"—a matter as to which the examiner has peculiar opportunities for observation; the Court there disapproved, 349 U.S. at 364, 75 S. Ct. 855 the statement of Judge Learned Hand on remand in N. L. R. B. v. Universal Camera Corp., 190 F.2d 429, 430 (2 Cir., 1951), on which the Court of Appeals had relied, 94 U.S.App.D.C. 353, 222 F.2d 781, 786 (1954), that "we are not to be reluctant to insist that an examiner's findings on veracity must not be overruled without a very substantial preponderance in the testimony as recorded." See N. L. R. B. v. Ra-Rich Mfg. Corp., 276 F.2d 451, 454 (2 Cir., 1960).

We thus may not properly set aside the portion of the Board's order relating to Scrima's discharge. But we are equally not obliged to enforce it. The Board's finding rested not merely on Spielman's statements on August 23 but on the

Board's views, erroneous as we all hold, that there was no credible evidence that Scrima's work was inferior or that Spielman believed him to be dischargeable for cause, and also that Spielman had done something seriously wrong in his interrogation of the employees on the previous day. Since we cannot tell whether the Board would make the same finding as to Spielman's intent in discharging Scrima with these supports removed, we should remand this phase of the case for appropriate reconsideration. N. L. R. B. v. Lundy Mfg. Corp., 286 F.2d 424 (2 Cir., 1960).